[No. 50752–0.   En Banc.   November 1, 1984.]

*In the Matter of the Guardianship of* OPAL INGRAM,
SHARON M. CARBERRY, *as Guardian ad Litem,*
*Appellant,* JAMES L. BREECE, *as*
*Guardian, Respondent.*

828

*Sharon M. Carberry* and *Michael W. Lynch,* for appellant (appointed counsel for appeal).

*Charles C. Countryman,* for respondent.

WILLIAMS, C.J.—The issues in this case concern a guardian's power to order surgery on an incompetent person who

has expressed her opposition to the surgery, and the standards to be applied by courts when facing such a situation. The case arises from the guardian's petition to order surgery filed July 12, 1984, in the Yakima County Superior Court. The evidence at the hearing on the petition showed that the ward had malignant cancer of the larynx, and that the only methods of treatment were either radiation therapy or removal of the vocal cords. The latter method has a higher success rate, but carries with it the complete loss of the ability to speak. The ward, although not fully able to comprehend her disability, has repeatedly expressed her opposition to the surgery and her apparent preference for radiation treatment. After the hearing the trial court ordered the surgery performed, but stayed the order pending appeal to this court. This court held a special en banc hearing on July 25, 1984, and issued an order reversing the trial court's order. With this opinion we give the reasons for that ruling.

I

Opal Ingram, a 66–year–old woman, is unable to care for herself and suffers from numerous physical ailments. On June 20, 1984, she was admitted into Yakima Valley Memorial Hospital. Mentally, she suffers from delusions as to the cause of her ailments, but is alert, has fluent speech, and for the most part is goal directed. Physically, she has severe pulmonary disease, hoarseness and shortness of breath. A throat specialist, Dr. Murphy, felt 90 percent certain that Ingram suffered from epidermoid carcinoma of the vocal cords involving both sides. To determine the extent of the cancer, the specialist would need to perform a biopsy or laryngoscopy. The options for treating the cancer are radiation treatment or surgery.

According to Murphy, if the cancer was limited to the vocal cords, radiation treatment would be attempted. Radiation involves one–half hour treatments five times a week for 5 or 6 weeks. Radiation gives the patient a local burning sensation, which can be eased by throat gargle by a cooper-

ative patient, or by intramuscular injections otherwise. Surgery would be done if the cancer was too extensive presently or in the future. It involves surgical removal of all the cancerous tissue including the vocal cords. The patient loses the ability to talk. With no treatment, the cancer would cause a very slow, very painful death by strangulation and/or starvation within 3 to 6 months.

On June 29, 1984, a petition for appointment of guardian was filed by Charles C. Countryman, a Yakima attorney, on behalf of Ingram's son, James L. Breece of Missouri. The petition alleged that "Opal Ingram is not capable of caring for her personal needs and lacks the capacity to consent to necessary medical and surgical attention." The hearing on the petition was set for July 6, 1984.

The court appointed Sharon M. Carberry as guardian ad litem, RCW 11.88.090(1), and later also appointed Michael Lynch, as independent, court appointed counsel for Ingram. RCW 11.88.045.

Carberry met with the doctors and with Ingram. She explained the guardian process to Ingram and informed Ingram of her rights. RCW 11.88.090(3)(a). Carberry filed her initial report with the court on July 6, 1984, the day of the hearing, pursuant to RCW 11.88.090(3)(b)(i), (ii), and (iii).

According to Carberry's report, Ingram "expressed great concern over both (1) continuing to receive adequate air intake through her trachea and (2) retention of her vocal cords." Ingram "evidenced no comprehension of the fact that her condition did not arise from a corroded or otherwise bad heater in the apartment she had been occupying." If appointment was necessary, Ingram indicated she had no opposition to the appointment of Breece.

At a second meeting with Carberry, Ingram again repeated her fear of losing her voice. The report stated that Ingram

> clearly would prefer radiation over surgery, and in fact indicated that she would not approve surgery, even in order to avoid death. She based this opposition on loss of

her vocal cords. She indicated reluctance to approve a biopsy due to its similarity, in her perspective, to surgery. She expressed no opposition to radiation as a treatment mode, but would not express a willingness to follow her doctors' advice to a biopsy followed by radiation.

The guardianship hearing was held July 6, 1984, with Ingram, Countryman, Carberry, and Lynch present. The purpose of this hearing was not to determine what sort of medical treatment Ingram required, but rather to make an initial determination of whether Ingram was incompetent and in need of a guardian. The court first determined the appointment of Breece was not contested, should the court deem guardianship necessary. The court received into evidence, without objection, a letter by a psychiatrist, Dr. Hardy, dated June 29, 1984, which stated: "[Ingram] is totally incompetent because of organic brain syndrome due to chronic obstructive pulmonary disease. . . . She has carcinoma of the larynx and is unable to comprehend her risks."

The only witness at the hearing was Dr. Vlahakis, a psychiatrist, who had examined Ingram that morning. He testified that although she was fully alert and could respond directly to questions she suffered from delusions regarding the cause of her illness, believing the main cause of her problems was the bad air in her apartment. Vlahakis diagnosed Ingram as having an "organic brain syndrome, a dementia. This [is] a moderate severity, and is also accompanied by delusions." Report of Proceedings, vol. 1, at 13. Ingram also has some difficulty with short term memory and was thus unable to retain relevant information to evaluate her medical treatment options. Cross examination of Vlahakis revealed that Ingram's organic brain disease might be ameliorated by medications and make "possible" Ingram's ability to understand and make treatment decisions.

The remainder of the hearing was devoted to arguments before the court concerning the authority of an appointed guardian to consent to medical treatments. The court ruled

that no surgery or biopsy could be performed until Ingram's doctors could testify at a hearing set for July 9, 1984.

On July 8, 1984, Ingram developed severe breathing difficulty, and Commissioner Brown authorized emergency surgery. A tracheostomy was performed and tissue samples were obtained to test for cancer. These samples were determined to be malignant.

Letters of guardianship were issued July 11, 1984. The next day Countryman filed a "Guardian's Petition for Court Authority to Authorize Surgery".

On July 13, 1984, Superior Court Judge Cameron Hopkins heard testimony on the petition. Dr. Murphy, Ingram's throat specialist, testified that Ingram had an "epidermoid carcinoma which is a lining–type of cancer of the voice box." Report of Proceedings, vol. 2, at 3. He discussed her options. With no treatment, the tumor would expand, eventually close off Ingram's larynx, and result in strangulation. Her life expectancy would be anywhere from 6 to 18 months. The two treatment options are surgery or radiation; chemotherapy is not effective. In Murphy's opinion, surgery would give Ingram a 70 to 80 percent chance of survival, whereas radiation therapy would give a 40 percent chance. If radiation therapy fails, a laryngectomy could still be performed, but would entail greater risk of complications; the chance of survival would be about 50 percent. Finally, even if the chosen treatment cures the cancer, Ingram's life expectancy is probably less than 5 years due to her lung disease.

Following either treatment, Ingram would require institutional care. High quality care is necessary following a laryngectomy because the trachea is brought out of the neck and the patient is left with a stoma that must be kept clear and hydrated. Also, laryngectomy patients often suffer depression for about 6 months. Following radiation therapy, Ingram, being incompetent, would need to be institutionalized because she must maintain a strict high calorie diet to ensure recovery. Radiation does not impair speaking

ability but is very painful, "as if you literally had a sunburn on the inside" of your throat. Report of Proceedings, vol. 2, at 14. Radiation therapy would leave Ingram with a dry, chronic sore throat.

Murphy testified that following a laryngectomy, a patient can learn to speak by means of an electrolarynx or by esophageal speech. An electrolarynx vibrates and allows the patient to mouth words. Ingram "probably could adjust to that with some help. I think people are very adaptive. Esophageal speech requires an enormous amount of motivation to do—she may not have that motivation." Report of Proceedings, vol. 2, at 8.

Murphy testified he was not certain which treatment was best for Ingram. Ninety–nine percent of his patients choose a laryngectomy. However, with a blind patient, radiation therapy was chosen because a laryngectomy "would totally alter her capacity of life". Report of Proceedings, vol. 2, at 16. Although a laryngectomy is optimal for competent persons, because of Ingram's incompetency Murphy was "not certain that's optimal for her." Report of Proceedings, vol. 2, at 5. Murphy concluded that surgery would probably be the best choice because radiation causes such pain and discomfort.

Dr. Egan, who performed the emergency tracheostomy, testified that Ingram's tumor was already too large to be cured by radiation therapy. He also stated that regardless of the treatment used Ingram will "have to have somebody [care for her] the rest of her life." Report of Proceedings, vol. 2, at 32. Without question, a laryngectomy would be his preference because Ingram would have her best chance of survival and some quality of life afterward. However, he also stated because of Ingram's incompetency, there was a "real possibility that this lady may never be able to communicate if you do a laryngectomy." Report of Proceedings, vol. 2, at 37.

The court's decision was postponed until the guardian ad litem Carberry, who had not been present, could review the testimony and contact family members for input. Carberry

reported her findings to the court on July 18, 1984. She had spoken to as many family members as she could, who reported that Ingram had been delusional and paranoid since at least her early 20's. She has led a life fairly independent of her family. Her son Breece, the petitioner, has difficulty discussing any subject with her for more than 5 minutes. Ingram usually ends conversations by laughing. Never having had a serious conversation with her regarding death, religion, or medical problems, he feels unable to make a substituted judgment.

Carberry said all six family members with whom she had spoken wanted Ingram to have the surgery. She found them to be motivated only by a concern for Ingram's welfare.

Carberry reiterated her belief that although Ingram had severe mental disabilities, she understood her medical problems sufficiently that her opposition to surgery should be respected.

After argument by counsel, the trial court granted the petition to authorize surgery. The court relied in part on Egan's testimony that Ingram's tumor was not amenable to radiation treatment and that surgery was therefore the only effective treatment. In its order the court stated that "the ward is not capable, mentally, to appreciate her risks and understand her need of surgery, nor can she understand that her prospects, with the surgery, may be that she will enjoy many years of remaining life without additional impact of cancer". The court recognized that as a general rule a terminally ill patient may forgo medical treatment. The court held, however, that because surgery offered a cure to Ingram's cancer, the State's interest in preserving life "overcome[s] the patient's desire not to have the surgery."

As noted above, this court held a special hearing to review the order, and, after argument by counsel, reversed the order.

## II

This is another in a series of recent cases in this court

involving medical treatment decisions for incompetent persons. Each case seems to correctly anticipate, yet recognize as distinguishable, the next case to come along.

In 1980, the court accepted "brain death" as the test for when a person is legally dead. *In re Bowman,* 94 Wn.2d 407, 409, 617 P.2d 731 (1980). The court in *Bowman* made clear, however, that it was not deciding "the much more difficult question" of whether life support systems may be terminated if a person is in a chronic, persistent vegetative state. *Bowman,* at 413.

In 1983, the court had to answer that question. *In re Colyer,* 99 Wn.2d 114, 660 P.2d 738 (1983). The court held that the guardian of a person in a chronic, persistent vegetative state could consent to the withdrawal of life support systems, at least where the family, the treating physicians, and a physician's prognosis board agree as to the proper treatment.

In *Colyer,* the incompetent patient had been competent before her disabling heart attack. The court was aware, however, that in some cases a patient in a persistent vegetative state will have always been incompetent so that his or her wishes regarding treatment decisions cannot be known. *See Colyer,* at 126. That situation arose recently in *In re Hamlin,* 102 Wn.2d 810, 689 P.2d 1372 (1984). In *Hamlin,* we held that if the treating physicians, a prognosis committee, and the appointed guardian all agree that the patient's best interests are served by termination of life-sustaining treatment, the decision to so terminate may be made without judicial involvement.

Finally, *Colyer* also distinguished cases in which the proposed treatment may cure or prolong the life of the patient, rather than merely prolong the dying process. The court made clear that it was not deciding the proper procedure for cases involving life prolonging or curative treatments. *Colyer,* at 127–28.

This appears to be such a case. The testimony of the physicians is that a laryngectomy offers a reasonable possibility of curing Ingram's cancer. It is also likely, however,

that it will destroy her ability to communicate. The case is further complicated by the fact that although Ingram is legally incompetent, she has repeatedly expressed opposition to the surgery. The questions this court must answer are (1) who is to make the treatment decision, and (2) what factors should the decision maker consider.

### III

Initially it should be noted that this case shares some common ground with *Colyer* and *Hamlin.* Unless outweighed by some state interest, a person has the right to choose one medical treatment over another, or even refuse medical treatment altogether. *See generally Colyer,* at 119–22. This personal right involves both a constitutional privacy right protected by the Fourteenth Amendment, *Doe v. Bolton,* 410 U.S. 179, 213, 35 L. Ed. 2d 201, 93 S. Ct. 739 (1973) (Douglas, J., concurring), and a common law right to be free from bodily invasion, *Colyer,* at 121 (citing *Physicians' & Dentists' Business Bur. v. Dray,* 8 Wn.2d 38, 111 P.2d 568 (1941)).

A judicial finding of incompetency does not deprive the ward of this right to choose or refuse treatment. *See Colyer,* at 124, and cases cited therein. The finding of incompetency merely means that the ward's rights will be exercised by the guardian on the ward's behalf. The first issue in this case is whether the guardian, who is appointed to exercise the ward's rights, RCW 11.92.040(3), must first seek court approval before consenting to the proposed surgery. The guardian did seek such approval in this case, but contends that it is not required under the guardianship statute.

Resolution of this issue requires interpretation of RCW 11.92.040(3), which sets out the guardian's duties regarding medical treatment for the ward. This statute states, in part, that the guardian must

care for and maintain the incompetent or disabled person, assert his or her rights and best interests, and *provide timely, informed consent to necessary medical*

*procedures . . . Provided . . .,* That nothing in this section shall be construed to allow a guardian . . . to consent to:

(a) Therapy or other procedure which induces convulsion;

(b) Surgery solely for the purpose of psychosurgery;

(c) *Amputation;*

(d) Other psychiatric or mental health procedures which are intrusive on the person's body integrity, physical freedom of movement, or the rights set forth in RCW 71.05.370.

A guardian . . . who believes such procedures to be necessary for the proper care and maintenance of the incompetent or disabled person shall petition the court for an order . . .

(Italics ours.)

Under this statute, court approval is required if the laryngectomy is an "amputation". The guardian contends that the laryngectomy is a necessary medical procedure, while the guardian ad litem and Ingram's attorney contend that the surgery is an amputation.

This court has not previously interpreted the meaning of "amputation" in RCW 11.92.040(3)(c). As commonly used, the word "amputate" usually means to cut off a limb or extremity such as a leg or hand. *See Webster's Third New International Dictionary* 74 (1963). *Blakiston's New Gould Medical Dictionary* 54 (1949), however, in its definition of "amputation", lists "an organ of the body" as something that can be amputated. This definition presumably would include surgical removal of the vocal cords. Dr. Murphy, the throat specialist who testified in this case, stated that although an amputation usually refers to an extremity, a laryngectomy could be considered an amputation.

■ We believe that the proposed laryngectomy should be considered an "amputation" for the purposes of RCW 11.92.040(3)(c). The apparent intent of the statutory exclusions to the guardian's powers is to require court approval before the guardian may consent to highly intrusive, irreversible medical treatment. For example, subsection (3)(a) requires court approval for any procedure that "induces

convulsion". Subsection (3)(b) requires court approval for psychosurgery such as a lobotomy. Finally, subsection (3)(d) requires court approval for any "psychiatric or mental health procedures which are intrusive on the person's body integrity [or] physical freedom of movement . . ." The common theme of these exclusions is that the guardian may not consent to extraordinary, irreversible procedures that would seriously affect a person's bodily integrity.

The proposed laryngectomy is such a procedure. It is invasive surgery resulting in the loss of speech, a consequence many would consider more severe than the amputation of a limb. To Opal Ingram, who has a life expectancy of 5 years (due to pulmonary disease) and who will in all likelihood spend those years under nursing care, the loss of the ability to speak could be devastating. In addition, a possible alternative treatment method exists, so that it is at least arguable that the surgery is not necessary medical treatment under RCW 11.92.040. Under these circumstances, we agree with the trial court that judicial approval was required before the guardian could consent to the surgery.

## IV

How does the trial court make the substantive treatment decision, once the guardian has petitioned the court? Many courts have wrestled with this difficult question.[1] There is general agreement among the various state courts regarding the goals courts should strive for and the factors which should influence their decisions.

All courts seem to agree that the goal is to do what the ward would do, if she were competent to make the decision. In *In re Colyer*, 99 Wn.2d 114, 137, 660 P.2d 738 (1983), we held that life sustaining treatment may be with-

---

[1] RCW 11.92.040(3) provides little guidance on this issue. It merely states that the court may order an amputation only in accordance with RCW 11.88.040, which specifies that notice must be given to all interested parties and that the ward has the right to attend the hearing.

drawn "if it is the guardian's [or the court's] best judgment that the patient, if competent to make the decision, would choose to have the life sustaining treatment removed . . ." Similarly, the New Jersey court stated that the guardian may exercise the patient's right to refuse life sustaining treatment if the guardian determines that "she would exercise it in these circumstances." *In re Quinlan,* 70 N.J. 10, 41, 355 A.2d 647 (1976). Those cases involved the discontinuation of life sustaining treatment, but the same principle also applies here, where the court must choose between alternate medical treatments. A person's right of self–determination includes the right to choose between alternate treatments as well as the right to refuse life sustaining treatment; the guardian's duty is to exercise this right on the ward's behalf, by doing what the ward would do if competent. *See State v. Northern,* 563 S.W.2d 197, 212 (Tenn. Ct. App. 1978) (Drowota, J., concurring) (in determining whether to amputate an incompetent woman's gangrenous feet, the question is what would she decide if she understood the facts).

In determining what the ward would do, if competent, the court makes a "substituted judgment" for the ward. The goal is not to do what most people would do, or what the court believes is the wise thing to do, but rather what this particular individual would do if she were competent and understood all the circumstances, including her present and future competency. *See Northern,* at 210 ("her decision, however unreasonable to others, would be accepted and honored by the Courts and by her doctors"). As one court stated:

> [The court should] ascertain the incompetent person's actual interests and preferences. In short, the decision in cases such as this should be that which would be made by the incompetent person, if that person were competent, but taking into account the present and future incompetency of the individual as one of the factors which would necessarily enter into the decision–making process of the competent person.

*Superintendent of Belchertown State Sch. v. Saikewicz,*
373 Mass. 728, 752–53, 370 N.E.2d 417 (1977);[2] *see also In
re Carson,* 39 Misc. 2d 544, 545, 241 N.Y.S.2d 288 (N.Y.
Sup. Ct. 1962) (court should "don the mental mantle of the
incompetent").

With this goal in mind, the court should consider all rel-
evant factors that would influence this person's decisions
regarding medical treatment. These would include the
ward's prognosis if she chose no treatment; the prognosis if
she chose one treatment over another; the risk of adverse
side effects from the proposed treatments; the intrusiveness
or severity of the proposed treatments; the ability of the
ward to cooperate and assist with post–treatment therapy;
the ward's religious or moral views regarding medical care
or the dying process; and the wishes of family and friends,
if those wishes would influence the ward's decision. The
court may also consider what most people would do in sim-
ilar circumstances, but as noted above, this should not be
regarded as controlling. *See Saikewicz,* at 749. For cases
that discuss the application of these and other factors as
they affect medical treatment decisions, *see Rogers v. Com-
missioner of Dep't of Mental Health,* 390 Mass. 489, 458
N.E.2d 308 (1983); *In re Roe,* 383 Mass. 415, 421 N.E.2d 40
(1981); *In re A.W.,* 637 P.2d 366, 375–76 (Colo. 1981). *See
also* Note, *The Substituted Judgment Doctrine Expands
Beyond Life–Prolonging Decisions,* 5 W. New Eng. L. Rev.
565, 581–84 (1983).

Finally, the ward's expressed wishes must be given sub-
stantial weight, even if made while the ward is incompe-
tent. *See, e.g., People ex rel. Medina,* 662 P.2d 184 (Colo.
Ct. App. 1982); *In re A.W., supra; In re Roe, supra.* In a
case involving the involuntary commitment of an incompe-

---

[2]As we noted in *Colyer,* at 125, the *Saikewicz* opinion has been criticized for
its holding that courts must be involved in every decision to withdraw life sus-
taining treatment. *See, e.g.,* Relman, *The Saikewicz Decision: A Medical View-
point,* 4 Am. J. of L. & Med. 233 (1978). The opinion's lengthy discussion of what
factors should govern the court's substantive decision, however, has been widely
accepted. *See* Relman, at 234.

tent, one court stated:

> Although [the incompetent] failed to understand his mental condition and his need for treatment, we think his stated preference must be treated as a critical factor in the determination of his "best interests."

(Citation omitted.) *Doe v. Doe,* 377 Mass. 272, 279, 385 N.E.2d 995 (1979).

In this case, for example, Ingram has stated on several occasions that she does not want the laryngectomy. She is not fully able to understand her medical problems, but her opposition to the surgery must be regarded as a strong indicator of what treatment she would choose if competent to do so. In addition, her inability to understand the need for surgery will bear heavily on her capacity to cope with the attendant loss of speech. She may feel only resentment for those that ordered her vocal cords removed, and be unwilling or insufficiently motivated to aid in her own rehabilitation. *Cf. Saikewicz,* at 754 (a patient who has no comprehension of the need for painful treatment "would experience fear without the understanding from which other patients draw strength"). Particularly where an alternative (albeit much less effective) treatment exists, the court should carefully consider the ward's preference.

To ascertain the patient's wishes the court should, if possible, interview the patient and observe her physical and mental condition. *In re A.W.,* at 375; *In re Moe,* 385 Mass. 555, 432 N.E.2d 712 (1982); *In re C.D.M.,* 627 P.2d 607, 613 (Alaska 1981). From this the court can determine to what extent, if any, the person understands her problems. Despite the finding of total legal incompetency under RCW 11.88.010, there are degrees of incompetency; some individuals are more incompetent than others. In *In re Hamlin,* 102 Wn.2d 810, 689 P.2d 1372 (1984) and *In re Colyer,* 99 Wn.2d 114, 660 P.2d 738 (1983), for example, the wards were in a vegetative state with no ability to reason or communicate. In this case Ingram, though legally incapable of managing her affairs or caring for herself, can nevertheless communicate with others and, at least to some extent,

understand her plight. The weight to be accorded the ward's preferences should therefore be influenced by the extent to which the ward understands her problem and the possible treatment methods. *In re C.D.M.,* at 613 n.17. In addition, the court's interview of the ward will indicate the intensity of the ward's stated preference. If the ward, despite her inability to understand her needs, is persistent and determined in her preference, it should be given additional weight in the determination.

In considering the above factors, the court need not place on any party any particular burden of proof or persuasion, nor give any presumption of validity to the petition of the guardian or guardian ad litem. Rather, the court should attempt as nearly as possible to make the decision as the patient would, by balancing all the benefits and drawbacks of the proposed treatments. This approach will best achieve the goal of exercising the ward's right as she would if she were competent to do so.

## V

When the decision maker has made its best judgment as to what the ward would choose, this choice must be weighed against any countervailing state interests. Four such interests are commonly stated:

> (1) the preservation of life; (2) the protection of interests of innocent third parties; (3) the prevention of suicide; and (4) maintenance of the ethical integrity of the medical profession.

*Colyer,* at 122.

In this case the only state interest that possibly applies is the first, that of preserving life. There are no dependent third parties who need the State's protection. *Cf. In re President & Directors of Georgetown College, Inc.,* 331 F.2d 1000 (D.C. Cir.), *cert. denied,* 377 U.S. 978, 12 L. Ed. 2d 746, 84 S. Ct. 1883 (1964) (blood transfusion ordered for mother of small child). Nor does this case involve suicide, for the guardian ad litem and Ingram's attorney are merely advocating the use of one (less effective) treatment method

over another. Finally, neither of the proposed treatments in this case would denigrate the integrity of the medical profession. *See Colyer,* at 123.

In *Colyer,* the court indicated that the state interest in preserving life would be greater where the proposed treatment offers a possible cure for the patient, rather than merely prolongs "a life inflicted with an incurable condition". *Colyer,* at 122. In this case, a laryngectomy might cure Ingram's throat cancer. For this reason the trial court held that "the State's interest [in saving a life] are compelling and overcome the patient's desire not to have the surgery." Report of Proceedings, vol. 3, at 26.

We disagree with the trial court. The curative potential of the laryngectomy is certainly relevant to the issue of whether Ingram would choose surgery. *See Rogers v. Commissioner of Dep't of Mental Health,* 390 Mass. 489, 458 N.E.2d 308, 319 (1983) ("[t]he likelihood of improvement or cure enhances the likelihood that an incompetent patient would accept treatment, but it is not conclusive"). If the decision maker were to determine, however, that Ingram would choose radiation (despite the curative potential of surgery), then the State's interest in preserving life would not outweigh that choice. This case does not present a choice between life and death. It presents a choice between two treatments, one carrying a greater curative potential, but the other offering less severe side effects. A person's right to self–determination includes the power to choose between these two treatments. Ingram does not lose this right of self–determination merely by virtue of her incompetence. *See Colyer,* at 124. Thus, if the substituted judgment is that Ingram would choose radiation treatment, this choice outweighs the State's interest in preserving life. *Cf. In re Roe,* 383 Mass. 415, 421 N.E.2d 40 (1981) (upholding incompetent's right to refuse administration of antipsychotic medication).

## VI

This court's July 25 order merely reversed the trial

court's order authorizing surgery; it did not order radiation therapy. The order was made without prejudice to further treatment, be it radiation or surgery. We did so because the trial court's analysis differed from the view of this court in two important respects. First, the order authorizing major surgery signed by the trial court stated that "[t]he Court is of the view that a rational person [faced with the facts of this case], would choose surgery as the best apparent alternative. . . ." If this means that Ingram would choose surgery if she were competent, the court applied the proper test. If the court applied a "reasonable person" test, however, based on what most people would do or what the average person would do, then its analysis differs from ours. As discussed above, the test is what this particular person would do, if she were aware of all the circumstances, including her present and future incompetency. It is a subjective test based on Ingram's attitudes, biases, and preferences, not what most people would do.

Second, the trial court believed that the State's interest in preserving life outweighed Ingram's desires to decline surgery. As noted above, we also disagree with this conclusion. For these reasons, the trial court was reversed.

UTTER, BRACHTENBACH, DOLLIVER, DORE, DIMMICK, PEARSON, and ANDERSEN, JJ., and HAMILTON, J. Pro Tem., concur.