[Nos. 62711-2-I; 62613-2-I. Division One. December 21, 2009.]

*In the Matter of the Guardianship of* SANDRA J. LAMB.

*In the Matter of the Guardianship of* REBECCA ROBINS.

538

*Michael L. Johnson* (of *Hardman & Johnson*), for appellants.

*Robert M. McKenna, Attorney General,* and *Jonathon Bashford, Assistant,* for respondent.

*Emily R. Cooper Pura* on behalf of Disability Rights Washington, amicus curiae.

*Nancy L. Talner, Sarah A. Dunne,* and *Laura J. Beveridge* on behalf of American Civil Liberties Union of Washington, amicus curiae.

¶1 LEACH, J. — The decision to award guardian fees lies within the discretion of the superior court. But the court may award fees only for work performed by the guardian that directly benefits the ward. In this appeal, we are asked to decide whether James and Alice Hardman, the coguardians of Sandra Lamb and Rebecca Robins, may be compensated for engaging in the specific advocacy activities listed in their advocacy report. Because the Hardmans fail to establish that these activities provide a direct benefit to their wards, we hold that they are not entitled to compensation under the facts of this case.

## FACTS

¶2 James Hardman and his mother, Alice Hardman, are certified professional guardians.[1] Approximately 23 of their wards are clients of the Department of Social and Health Services (DSHS) residing at Fircrest School. Fircrest is one of five residential habilitation centers (RHCs) established by state law to serve people with developmental disabilities. Among the Hardmans' wards residing at Fircrest are Sandra Lamb and Rebecca Robins.

### A. Sandra Lamb

¶3 Lamb is a 53-year-old woman with a medical diagnosis of "profound mental retardation" resulting from a meningitis infection she suffered sometime before age three. With communication skills level comparable to a two-and-one-half- to three-year-old, Lamb has multiple disabilities, including limited speech and articulation, seizure disorder, mild microcephaly, hearing loss, and hemiplegia. She receives a monthly income of $1,106 in Social Security Administration benefits and is the beneficiary of a special needs trust established in 2008.

---

[1] RCW 11.88.008 defines a "professional guardian" as "a guardian appointed under this chapter who is not a member of the incapacitated person's family and who charges fees for carrying out the duties of court-appointed guardian of three or more incapacitated persons."

¶4 Lamb has resided at Fircrest since 1964. In 1982, she was placed in a community group home but was returned to Fircrest due to her "fits of anger and anti-social behavior." In 1986, the King County Superior Court declared Lamb an incapacitated person (IP). Dr. Lee Miller, a staff physician at Fircrest, recommended against community placement in favor of a structured environment. In 1993, Ms. Hardman was appointed as the guardian of the person and estate of Lamb. The order states that Lamb "shall not retain her right to vote." Mr. Hardman was appointed coguardian in 1997. In 2004, Lamb and four other of the Hardmans' wards were relocated to Rainier RHC in Buckley, Washington. The Hardmans filed an action under the abuse of vulnerable adults statute, chapter 74.34 RCW, in King County Superior Court in 2006 and requested Lamb's return to Fircrest. In 2007, Lamb was returned to Fircrest,[2] and the Hardmans obtained a financial settlement for her the next year.

¶5 On May 2, 2008, the Hardmans filed a triennial guardian's report for Lamb. In their report, the Hardmans requested approval of their guardian fees for the prior reporting period. They also sought an allowance for the new three-year period of $225 per month for guardian fees for routine services and $150 per month for "special advocacy fees." In support of their request for special advocacy fees, the Hardmans attached a 16-page document, titled "Advocacy Report of James R. Hardman," listing various advocacy activities undertaken from January 2004 until February 2008.[3] The report states that during this period the Hardmans worked with advocacy groups such as Friends of Fircrest, the Fircrest Human Rights Committee, and Action for RHCs to lobby state and local officials. Mr. Hardman also worked "within the Washington State Disabilities

---

[2] In the advocacy report, the Hardmans claim that "Lamb's suffering appeared to cease the moment she returned. The transformation in her mood was stunning. She has been extraordinarily happy since returning to Fircrest."

[3] The report also extensively discusses the Hardmans' litigation efforts. The Hardmans are not seeking compensation for the time spent on litigation in this case.

Issues caucuses [and] the State Democratic convention as a delegate to advocate for the resolution of support for Fircrest and other State RHCs." In June 2008, the Hardmans traveled to Washington D.C. to attend the annual Voice of the Retarded conference and lobby "every State of Washington Congressional office." In addition to lobbying officials, the Hardmans opposed legislation proposed in 2007 that would have created a commission with authority to close RHCs and championed legislative initiatives, including

> bills which would extend to RHC residents the rights . . . contained in RCW 70.129; incentives for Washington colleges to include courses concerning the treatment of people with developmental disabilities [DD]; background checks for all who care for people with DD; funding for RHCs; and, whistleblower protection for professionals who treat people [i]n RHCs.

The report further describes the Hardmans' efforts to prevent certain types of development around the Fircrest area by attending land use meetings. Finally, the report describes the informational and public relations materials produced by the Hardmans, including a monthly newsletter and a PowerPoint presentation about the challenges facing Fircrest residents. Though the report states that "[t]hese efforts are not easily segregated from one another," it justifies the Hardmans' request for a monthly allowance of $150 for each ward by taking the total time spent on advocacy, approximately 80 hours, divided by the total number of the Hardmans' wards at Fircrest, and multiplying that number by Mr. Hardman's hourly rate.

¶6 DSHS filed an objection to the Hardmans' request for the proposed fees on June 2, 2008. The Hardmans filed a response, a supplement to Lamb's report, and declarations regarding fees for routine services and for "ongoing special advocacy activities." In the declarations, the Hardmans increased their request for routine services to $235 per month and explained that the advocacy fees were justified because

[m]oving medical and/or behaviorally fragile people is potentially hazardous to their health and well-being. Closing RHCs would necessitate such moves. My clients are medically and/or behaviorally fragile. Remaining where they are successful and in a medical facility where their great needs are met is essential. This has required great and determined effort, fostering allies, and using groups.

The Hardmans reiterated themes stated in their advocacy report—namely, that their advocacy efforts were necessary to combat the political threat posed by key DSHS officials, disability rights organizations, and real estate developers that favored closing Fircrest.

## B. Rebecca Robins

¶7 Rebecca Robins is a 53-year-old woman suffering from "profound or severe mental retardation" since birth. Functioning at a level comparable to that of an 18-month-old, Robins has no speech abilities and has been diagnosed with autism, scoliosis, self-injurious behavior, and aggression. She receives a monthly income of $892 from a railroad retirement account.

¶8 Robins has resided in Fircrest since 1984. In 1985, the King County Superior Court deemed Robins an IP. Due to her "tantrum like behavior with repeated spitting and kicking," Dr. Miller recommended against community placement, reasoning that her behavior "would likely make it extremely difficult or almost impossible for her to be [in] a community group home setting." Ms. Hardman was appointed guardian of the person and estate of Robins in 1993, and Mr. Hardman was appointed coguardian in 1998.

¶9 On May 9, 2008, the Hardmans filed a biennial guardian report for Robins, seeking approval of their guardian fees for the prior reporting period and an allowance for the new three-year period of $235 per month for guardian fees for routine services and $150 per month for "special advocacy fees." In support of their request for "special advocacy fees," the Hardmans attached the same advocacy report that they had submitted for Lamb.

## C. Joint Hearing and Appeal

¶10 On June 6, 2008, at a joint hearing for Lamb and Robins, the commissioner approved both reports and awarded an allowance of $175 per month for guardian fees for routine services and $150 per month for special advocacy activities. The commissioner found that Mr. Hardman's declaration regarding ongoing advocacy activities sufficiently stated the "causal connection between the advocacy work that's being done and the individual benefit that's being conferred." The commissioner required the Hardmans to "submit a report specifically reporting the time spent on advocacy and specifically relating the benefit conferred by that advocacy" on Lamb and Robins at the next accounting.

¶11 On June 16, 2008, DSHS filed a motion to revise the commissioner's orders. The Hardmans filed a response. Hearings were held in King County Superior Court on August 28 and September 5, 2008. In revising the orders and partially denying the Hardmans' request for advocacy fees, the superior court differentiated between the advocacy activities described in the report:

a. The political and lobbying activities undertaken by Guardians are outside the scope of their guardianship of Ms. Lamb. The Guardians' request for extraordinary fees for the next reporting period are denied to the extent that those fees relate to political and lobbying activities.

b. Community outreach activities that are necessary to protect the best interests of Ms. Lamb are within the scope of the guardianship. Therefore, the Motion to Revise is denied and the Guardians' extraordinary fees claimed for the next reporting period are allowed to the extent that those fees relate to community outreach that is necessary to protect the best interests of Ms. Lamb. The court finds that the fees for those activities currently amount to between $50 and $75 per month.

The Hardmans filed motions for reconsideration, which the court denied without explanation.

¶12 The Hardmans appealed the superior court's orders regarding their requests for special advocacy fees for Lamb and Robins, as well as the orders denying their motions for reconsideration. The appeals were consolidated by this court. DSHS cross-appealed the portions of the orders awarding an allowance for the Hardmans' community outreach activities.[4]

## STANDARD OF REVIEW

■■ ¶13 A superior court's award of guardian fees and costs is reviewed for an abuse of discretion.[5] An abuse of discretion occurs when the court's decision is manifestly unreasonable or based on untenable grounds.[6] The court necessarily abuses its discretion when its decision is based on an erroneous view of the law or involves application of an incorrect legal analysis.[7] But if pure questions of law are presented, a de novo standard of review should be applied to those questions.[8] Issues of statutory construction are also reviewed de novo.[9]

## ANALYSIS

A. Compensation for the Hardmans' Advocacy Activities

¶14 The Hardmans contend that they are entitled to compensation for their advocacy activities as the personal

---

[4] The American Civil Liberties Union of Washington filed an amicus brief in support of the Hardmans. Disability Rights Washington filed an amicus brief in support of DSHS.

[5] *In re Guardianship of Spiecker*, 69 Wn.2d 32, 34-35, 416 P.2d 465 (1966) (citing *In re Estate of Leslie*, 137 Wash. 20, 241 P. 301 (1925)).

[6] *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971) (citing *MacKay v. MacKay*, 55 Wn.2d 344, 347 P.2d 1062 (1959)).

[7] *Dix v. ICT Grp. Inc.*, 160 Wn.2d 826, 833, 161 P.3d 1016 (2007).

[8] *See Ang v. Martin*, 154 Wn.2d 477, 481, 114 P.3d 637 (2005).

[9] *Wash. Cedar & Supply Co. v. Dep't of Labor & Indus.*, 137 Wn. App. 592, 598, 154 P.3d 287 (2007) (stating that agency rules are reviewed de novo as if they were statutes, but that the court gives "substantial weight to an agency's interpretation of statutes and regulations within its area of expertise").

guardians of Lamb and Robins.[10] According to the Hardmans, the framework governing guardian compensation and expenses requires "some nexus between the guardians' activities and the best interests of [the wards]," but "no actual benefit must be shown." DSHS responds that a direct benefit to the ward must be shown for the court to award fees.

¶15 In Washington, a guardian is entitled to "such compensation for his or her services . . . as the court shall deem just and reasonable."[11] The court may also award "[a]dditional compensation . . . for other administrative costs, including services of an attorney."[12] "But [a] court may not award fees simply on the basis of work performed. Rather, the court must determine the need for the work done and whether it benefited the guardianship."[13]

¶16 *In re Guardianship of McKean*[14] demonstrates this required showing of a direct benefit. In that case, the trial court appointed guardians to protect two minor daughters' assets in relation to their father's dissolution proceedings.[15] The court later authorized payments of the guardians' fees and costs, as well as attorney fees, from the daughters' guardianship assets.[16] On appeal, the father argued that the court abused its discretion in ordering the award of fees.[17] In upholding the award, Division Two emphasized that the guardian had shown a direct benefit to the guard-

---

[10] Under RCW 11.92.043(4), a guardian of a ward's person is charged with the duty "to care for and maintain the incapacitated person in the setting least restrictive to the incapacitated person's freedom and appropriate to the incapacitated person's personal care needs, [and to] assert the incapacitated person's rights and best interests."

[11] RCW 11.92.180.

[12] RCW 11.92.180.

[13] *In re Guardianship of McKean*, 136 Wn. App. 906, 918, 151 P.3d 223 (2007) (citation omitted).

[14] 136 Wn. App. 906, 151 P.3d 223 (2007).

[15] *McKean*, 136 Wn. App. at 909-11.

[16] *McKean*, 136 Wn. App. at 917-18.

[17] *McKean*, 136 Wn. App. at 917-18.

ianship. Specifically, the work performed by the guardian had brought to light the daughters' assets and interests, a task that had eluded two previous guardians ad litem and the judge in the dissolution proceedings.[18]

¶17 In this case, the Hardmans have not shown that their advocacy activities directly benefit Lamb and Robins. Essentially, the Hardmans claim that the direct benefit derived from their advocacy activities is the prevention of their wards' removal from Fircrest. But the Hardmans' advocacy activities do not provide this benefit since none of the perceived threats to Fircrest, as described in the reports, would have necessarily led to its closure and forced Lamb and Robins to relocate. Nor have the Hardmans presented any expert evidence in support of their opinion that maintaining Lamb and Robins at Fircrest would be in their best interests.[19] Their reports discuss only the potential benefit conferred upon a class of IPs under the Hardmans' care. Accordingly, we affirm the superior court's decision denying an allowance for the Hardmans' political and lobbying activities, but on grounds that the Hardmans have not sufficiently shown that these activities directly benefit Lamb and Robins.

■ ¶18 On DSHS's cross appeal, we reverse the court's award of a monthly allowance of $75 for the Hardmans' community outreach activities on the same grounds. Even if the Hardmans had demonstrated a direct benefit from their community outreach activities, the court's order contains insufficient findings supporting the amount of the award to permit appellate review.[20] The order provides neither the court's rationale for differentiating between political and community outreach activities nor the factual basis for determining the amount of the allowance for community outreach activities.

---

[18] *McKean*, 136 Wn. App. at 919.

[19] Because the Hardmans fail to establish that their advocacy activities directly benefit Lamb and Robins, we need not address whether these activities qualify as "extraordinary services" under WAC 388-79-050.

[20] *Estrada v. McNulty*, 98 Wn. App. 717, 723-24, 988 P.2d 492 (1999).

¶19 The Hardmans assert several alternative grounds in support of their requests for advocacy fees. None of these has merit.

¶20 First, the Hardmans raise a preemption argument, claiming that the state guardianship statutes conflict with certain provisions of the Medicaid Act—namely, 42 U.S.C. § 1396p(a)(1) and (b)(1).[21] Because these provisions generally prohibit DSHS from imposing liens and seeking adjustments or recoveries from an individual's property and because the exceptions to these statutes do not apply here, the Hardmans assert that "state statutes and regulations imposing financial liability are inoperative to the extent they are inconsistent."[22]

¶21 "Where Congress has not expressly preempted or entirely displaced state regulation in a specific field, as with the Medicaid Act, 'state law is preempted to the extent that it actually conflicts with federal law.' "[23] A conflict between state and federal law arises where the state law " 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' "[24]

¶22 Contrary to the Hardmans' position, no conflict exists between state statutes "imposing financial liability" and the Medicaid Act because federal regulations imple-

---

[21] The anti-lien provision contained in 42 U.S.C. § 1396p(a)(1) provides that "[n]o lien may be imposed against the property of any individual prior to his death on account of medical assistance paid or to be paid on his behalf under the State plan" and lists two exceptions that do not apply here. The antirecovery provision contained in 42 U.S.C. § 1396p(b)(1) provides that "[n]o adjustment or recovery of any medical assistance correctly paid on behalf of an individual under the State plan may be made, except [under circumstances that are not pertinent to this case]."

[22] The Hardmans explain that "imposing financial liability" means "the extent a Medicaid recipient . . . is required to apply his or her social security benefit to pay towards his cost of care." The Hardmans later inconsistently argue that "federal law permits, but does not impose, financial liability on Medicaid recipients."

[23] *Lankford v. Sherman*, 451 F.3d 496, 510 (8th Cir. 2006) (quoting *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203-04, 103 S. Ct. 1713, 75 L. Ed. 2d 752 (1983)).

[24] *Lankford*, 451 F.3d at 510 (internal quotation marks omitted) (quoting *Pac. Gas & Elec. Co.*, 461 U.S. at 204); *see also Hankins v. Finnel*, 964 F.2d 853, 861 (8th Cir. 1992).

548

menting the act require that "an agency must reduce its payment to an institution, for services provided to an individual," by the amount of the individual's income that remains after certain deductions have been made, such as a personal needs allowance.[25] These regulations apply to state agencies and prohibit them from paying any amounts that are the responsibility of the patient.[26] Thus, under both federal and state regulations, RHC residents are required to apply their income, minus certain allowances, to the cost of their care. There is no conflict preemption.

¶23 The Hardmans next argue that state guardianship statutes abridge the superior court's powers to award guardian fees, citing *Blanchard v. Golden Age Brewing Co.*[27] There, the legislature enacted a law barring courts from issuing injunctions in labor disputes except under limited circumstances. Noting that "[t]he writ of injunction is the principal, and the most important, process issued by courts of equity, it being frequently spoken of as the 'strong arm of equity,'"[28] our Supreme Court held that the statute was unconstitutional because "[t]he legislature cannot indirectly control the action of the court by directing what steps must be taken in the progress of a judicial inquiry, for that is a judicial function."[29] Because a state court's authority to award guardian fees from the income of Medicare beneficiaries is not comparable to the court's equitable power to issue injunctions, *Blanchard* is inapposite.

¶24 Finally, the Hardmans and amicus American Civil Liberties Union of Washington argue that the superior court's orders deprive Lamb and Robins of their rights to petition the government under the state and federal consti-

---

[25] 42 C.F.R. §§ 435.725, .733, .832; 42 C.F.R. § 436.832.

[26] *See Florence Nightingale Nursing Home v. Perales*, 782 F.2d 26, 29 (2d Cir. 1986) (stating that 42 C.F.R. §§ 435.725 and 435.832 "are consistent with the statutory plan that Medicaid funds not be paid to reimburse those costs that patients with resources of their own can afford").

[27] 188 Wash. 396, 63 P.2d 397 (1936).

[28] *Blanchard*, 188 Wash. at 415.

[29] *Blanchard*, 188 Wash. at 418.

tutions. But they fail to cite any relevant case law establishing that a guardian may exercise political rights of an IP, such as the right to petition, in the IP's best interests when the IP cannot express his or her preferences. Instead, the cases they cite primarily involve the right to refuse life-sustaining treatment.[30]

## B. Attorney Fees

¶25 The Hardmans request an award of attorney fees on appeal under RAP 18.1 and RCW 11.96A.150.[31] Because they have not prevailed on appeal, we decline their request. Given the unique issues in this case, we also deny the Hardmans' request for fees below.[32]

## CONCLUSION

¶26 The Hardmans fail to establish that the advocacy activities listed in their report provide a direct benefit to their wards. We therefore affirm the superior court's decision denying an allowance for the Hardmans' political and lobbying activities, though on different grounds,[33] and reverse its decision awarding a monthly allowance of $75 for community outreach activities.

ELLINGTON and LAU, JJ., concur.

Review granted at 169 Wn.2d 1010 (2010).

---

[30] *In re Guardianship of Ingram*, 102 Wn.2d 827, 829, 689 P.2d 1363 (1984) (reversing a trial court order imposing surgery to treat malignant cancer of the larynx when the IP expressed a preference for radiation treatment); *In re Welfare of Colyer*, 99 Wn.2d 114, 123, 660 P.2d 738 (1983) (holding there were "no compelling state interests opposing the removal of life sustaining mechanisms from [a patient in a chronic vegetative state] that outweighed her right to refuse such treatment"); *In re Guardianship of Hamlin*, 102 Wn.2d 810, 815, 689 P.2d 1372 (1984) (concluding that cardiopulmonary resuscitation could be withheld from irreversibly comatose patient).

[31] The commissioner approved $10,000 for litigation expenses associated with the appeal.

[32] *In re Estate of D'Agosto*, 134 Wn. App. 390, 402, 139 P.3d 1125 (2006) (noting case law in which attorney fees were denied where difficult or novel issues were presented).

[33] *Silverstreak, Inc. v. Dep't of Labor & Indus.*, 159 Wn.2d 868, 876, 154 P.3d 891 (2007).