# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In re the Guardianship of:<br><br>JAMES P. HALLIGAN,<br><br>      An Incapacitated Person,<br><br>VICTORIA E. HALLIGAN,<br><br>      Appellant,<br><br>v.<br><br>NORTHERN TRUST COMPANY and<br>DAVID N. DEL SESTO,<br><br>      Respondents. | DIVISION ONE<br><br>No. 73314-1-I<br><br><br>UNPUBLISHED OPINION<br><br><br><br><br>FILED: May 23, 2016 |

DWYER, J. — Under applicable guardianship law, when a court-appointed guardian petitions the court for relief on behalf of the ward—such as permission to change an acting trustee pursuant to a trust—the requested relief must be in the ward's "best interest."[1] The final decision of whether such relief is in the ward's best interest rests with the "court making the appointment."[2] In this way, the court maintains its role as "'the superior guardian of the ward.'"[3] In this case, Victoria Halligan, as the court-appointed guardian of her father James, petitioned the superior court seeking permission to remove the acting co-trustees of the Halligan Trust, Northern Trust Company (Northern), and David N. Del Sesto, and

---

[1] RCW 11.92.043(4); In re Guardianship of Lamb, 173 Wn.2d 173, 191, 265 P.3d 876 (2011).

[2] RCW 11.92.010.

[3] Lamb, 173 Wn.2d at 190 (quoting Seattle-First Nat'l Bank v. Brommers, 89 Wn.2d 190, 200, 570 P.2d 1035 (1977)).

replace them with Whittier Trust Company (Whittier), asserting that this change was in James's best interest. Given that the superior court was presented with a range of evidence concerning whether such a change was proved to be in James's best interest, and given that the superior court made a choice among the alternatives that was both within this range of evidence and supported by substantial evidence, there was no abuse of judicial discretion. Accordingly, we affirm both the superior court's denial of Victoria's initial petition and her subsequent motion for reconsideration.

I

James P. Halligan and Marcia S. Halligan were husband and wife. Together they had three children: Victoria E. Halligan, Denisia K. Halligan, and Christopher M. Halligan.[4] All of these children are now adults.

On April 29, 1996, James and Marcia created two revocable living trusts—the Halligan Trust and the Marcia S. Halligan Trust (the Trusts)—to hold, administer, and eventually distribute their assets.[5] James and Marcia transferred substantially all of their assets to the Trusts, including two residential properties, promissory notes, cash, securities, and fractional interests in limited partnerships, limited liability companies, and a corporation.

By the end of 2008, James was diagnosed with dementia.[6] In September of that year, James and Marcia simultaneous amended and reinstated the

---

[4] For clarity, we refer to all of the Halligans by first name.

[5] Unless otherwise noted, we refer to the trusts collectively.

[6] We are informed of this fact from a medical report in the record that was once sealed. Both parties have referenced the contents of the report in their brief or argument and, each party concedes, we may publicly reference the contents of the report in our resolution of this dispute.

Trusts.[7] The amended Halligan Trust provided that James and Marcia were the primary income and principal beneficiaries of the Halligan Trust during each of their lifetimes, with their children named as the primary remainder beneficiaries.

Additionally, James and Marcia appointed themselves as co-trustees of the Halligan Trust and provided that, in the event that they both became unable to serve as co-trustees, Del Sesto and Northern would be appointed to serve as successor co-trustees. The Halligan Trust included a provision that set forth the order of succession:

### APPOINTMENT OF SUCCESSOR TRUSTEE

A. JAMES P. HALLIGAN and MARCIA S. HALLIGAN are appointed as Co-Trustees. In the event of the death, disability, refusal to serve, or resignation of either JAMES P. HALLIGAN or MARCIA S. HALLIGAN, then the remaining person is appointed as sole Trustee. In the event of the death, disability, refusal to serve, or resignation of both JAMES P. HALLIGAN and MARCIA S. HALLIGAN, then DAVID N. DEL SESTO and NORTHERN TRUST are appointed as Co-Trustees. In the event of the death, disability, refusal to serve, or resignation of DAVID N. DEL SESTO, then NORTHERN TRUST is appointed as sole Trustee. At any time that a corporate fiduciary is serving as Trustee hereof, DAVID N. DEL SESTO shall have the right to remove the corporate fiduciary as Trustee hereof and appoint in writing another corporate fiduciary with funds under management of not less than eighty percent (80.0%) of the funds under management of the current corporate fiduciary as of the date of the change of corporate fiduciary.

Article VIII, Paragraph A.

---

[7] The Marcia S. Halligan Trust was simultaneously amended and reinstated on September 12. The Halligan Trust was simultaneously amended and reinstated on September 26.

Notwithstanding this order of succession, James and Marcia also reserved in the Halligan Trust—for the surviving trustor—an unfettered power to remove an acting trustee and to appoint a successor trustee. Article VIII, Paragraph B.

On August 10, 2014, Marcia died. The Halligan Trust provided that, upon the death of the first trustor—in this case, Marcia—the Trust assets would be divided into three separate trusts: (1) Survivor, (2) Decedent, and (3) Marital. As the surviving trustor, James became the sole income and principal beneficiary of the Trusts.[8]

On August 28, Del Sesto and Northern assumed their role as successor co-trustees of the Trusts.

On December 23, Victoria was appointed guardian of James, as to both his person and estate.

On January 7, 2015, Victoria, as James's court-appointed guardian, filed a petition seeking the superior court's permission to remove Del Sesto and Northern as acting co-trustees, and to appoint Whittier as successor trustee of the Trusts.[9] In so petitioning, Victoria asserted her belief that removing Del Sesto and Northern as acting co-trustees, and replacing them with Whittier, was in James's best interest given the cost savings to the Trusts that would result from such a replacement.

---

[8] As a result of Marcia's death, the assets that were held in the Marcia S. Halligan Trust were distributed into the Halligan Trust to be administered under the terms of the Halligan Trust.

[9] According to a declaration provided by Charles Adams III, the senior vice president and manager of Whittier's real estate department in South Pasadena, California, Whittier is a company that "oversee[s] the daily and long term management of properties in client accounts and perform[s] services that include leasing, property management, and oversight of third party property managers, maintenance, capital improvement, financing, acquisition, and disposition."

Del Sesto and Northern opposed Victoria's petition. In doing so, Del Sesto and Northern pointed the superior court to the following evidence in support of their assertion that removing them as acting co-trustees was not in James's best interest.

First, testimony from Del Sesto, Mark A. Hardtke, a senior vice president at Northern, and Victoria's sister Denisia, indicated that James and Marcia did not want their children—particularly Victoria—having any control over the Trusts. Del Sesto testified that, "I was told clearly (and observed) that the Halligan children did not have knowledge or experience about the holdings and that Mr. and Mrs. Halligan did not have confidence that they could work together to manage the assets, either during Mr. and Mrs. Halligan's lifetime, or after either or both of their deaths." Consistent with Del Sesto's testimony, Hardtke testified that, "I clearly understood that the Halligans did not want any of their children exercising any control over their assets or choosing any different trustee other than Mr. Del Sesto." Concerning Victoria in particular, Denisia testified that, "Victoria has never been involved in any of our parents' business affairs" and that "[c]hanging trustees now, to someone selected by Victoria, will increase her ability to attempt [to have] control over the Trusts, which my parents were vehemently opposed to."

Second, testimony from Del Sesto and Susan J. Merritt, a senior vice president at Northern, indicated both that James and Marcia were aware of the fees that would be charged at the time that they selected Del Sesto and Northern as co-trustees and that the fees that were charged in 2014—the first year of

service—were actually less than the amount that was originally quoted to James and Marcia. Del Sesto testified both that "Northern Trust provided a fee schedule to the Halligans when Northern Trust was interviewed," and that "the cost of services was clearly explained to Mr. and Mrs. Halligan when they selected Northern Trust and me as their successor co-trustees." Regarding the fees that were actually charged in 2014, Merritt testified that, "the fee that Northern Trust is charging for the first year of services is significantly lower than the fee that would have been charged under the standard fee schedules," and that "the annual fee for trustee services and asset management will be reviewed after the first year." Merritt also testified that Del Sesto and Northern will charge a one-time estate settlement fee which is set at a "significantly lower" rate than the rate set forth in the standard fee schedule.[10]

Third, testimony from Del Sesto, Hardtke, Merritt, and Denisia detailed both Del Sesto's competence in managing the assets held in the Trusts and James's and Marcia's expressed desire for him to serve as a co-trustee. Del Sesto testified that, "I have a long-standing relationship with the family and intimate knowledge of the family and its holdings, having managed the assets of the Trusts for nearly 20 years." Hardtke attested that, "[i]t was clear that Mr. Del Sesto[ ] knew more about the ins and outs and day to day management of the various entities and properties than anyone and that the Halligans had the utmost confidence in Mr. Del Sesto. They took great comfort in knowing that Mr. Del

_____

[10] Merritt further testified that this estate settlement fee will be paid entirely from Marcia's portion of the Trusts, meaning that it will not diminish the assets that are held in James's survivor trust.

- 6 -

Sesto was handling everything and that he would continue to do so beyond their own involvement." Consistent with Hardtke's testimony, Merritt testified that, "Mr. Halligan's beneficial interest in the Trusts is best served by the historical knowledge, experience, and skills of Mr. Del Sesto as co-trustee." Finally, Denisia attested that, "David Del Sesto has always managed the real estate, quite profitably for the family, and my parents trusted him implicitly."

Fourth, testimony from Del Sesto and Hardtke detailed both Northern's competence in managing the assets held in the Trusts and James's and Marcia's expressed desire for the company to serve as a co-trustee. Del Sesto testified that, "Northern Trust was selected by Mr. and Mrs. Halligan to serve with me as co-trustee after Mr. and Mrs. Halligan had interviewed and considered several corporate fiduciaries in their search for the appropriate co-trustee to serve with me." Regarding the specific reasons why Northern was chosen, Hardtke attested that, "I understood that, for a number of reasons, including our size, stability and geographic footprint, Northern Trust was Mr. and Mrs. Halligan's preferred choice for serving as corporate trustee with Mr. Del Sesto." Hardtke also spoke to Northern's competence, stating that, "Northern Trust has spent weeks/months doing its due diligence and working to fully understand all aspects of the ongoing trust administration."

Fifth, testimony from Del Sesto and Merritt detailed the complex nature of the assets held in the Trusts. Del Sesto testified that, "[t]he assets owned by these Trusts are complex and include fractional interests in limited partnerships, limited liability companies, a corporation, promissory notes, cash and securities.

Several of the entities are parties to joint venture agreements with outside, non-family members. The entities whose interests are held in the Trusts own commercial real estate, a strip center, an industrial building, two large shopping centers, several ground leases with national tenants, and some unimproved land." Consistent with Del Sesto's testimony, Merritt testified that, "[t]he ownership structure of the business entities, along with the assets held inside the entities is very complex."

Sixth, testimony from Merritt and Hardtke detailed the difficulty in replacing the current co-trustees given the time-sensitive nature of certain obligations under the Trusts. Merritt testified to the need to pay or refinance outstanding debts, prepare and file tax returns, respond to third party interest in acquisition of certain assets held in the Trusts, and complete a liquidity analysis of the assets held in the Trusts. Merritt further testified that replacement of the co-trustees would "place at risk the Trusts' ability to obtain sufficient liquidity to address the Trusts['] liabilities in a timely and prudent manner." Consistent with Merritt's testimony, Hardtke opined that, "[r]eplacing both Northern Trust and Mr. Del Sesto concurrently would be tantamount to starting back at square one for any successor and the likely result would be additional delays, cost and perhaps detrimental outcomes for the trust beneficiaries."

Seventh, the plain language of Article VIII, Paragraph A of the Halligan Trust, evidences James's and Marcia's intent to have Del Sesto and Northern serve as co-trustees. In this provision, James and Marcia set forth that "[i]n the event of the death, disability, refusal to serve, or resignation of both JAMES P.

HALLIGAN and MARCIA S. HALLIGAN, then DAVID N. DEL SESTO and NORTHERN TRUST are appointed as Co-Trustees." Del Sesto and Northern asserted their belief to the superior court that James's and Marcia's specific selection of them as co-trustees within the Halligan Trust itself evidenced James's and Marcia's intent to have these parties, together, manage the assets held within the Trusts.

On January 26, 2015, the superior court heard argument on Victoria's petition. After hearing the argument of counsel, and considering the documents that the parties submitted in support of their positions, the superior court denied the petition.

On February 5, Victoria filed a motion for reconsideration. Therein, she reiterated her belief that removal of Del Sesto and Northern would be in James's best interest and asserted—for the first time—that James, in 2008, had lacked the mental capacity to choose Del Sesto and Northern as successor co-trustees.

On February 23, the superior court heard argument on Victoria's motion for reconsideration. After hearing the argument of counsel, the superior court denied Victoria's motion. She now appeals.

II

Victoria first contends that the superior court erred by denying her initial petition to authorize a change of trustee. Specifically, she asserts that the superior court erred by concluding that removing Del Sesto and Northern as co-trustees, and replacing them with Whittier, was not proved to be in James's best interest. We disagree.

- 9 -

"The management of a guardianship by the superior court is reviewed for abuse of discretion." In re Guardianship of Cornelius, 181 Wn. App. 513, 528, 326 P.3d 718 (2014). A trial court abuses its discretion when its decision is based on untenable grounds or reasons. In re Guardianship of Johnson, 112 Wn. App. 384, 388, 48 P.3d 1029 (2002). But a trial court does not abuse its discretion when its decision is within the range of acceptable choices, given the facts and the applicable legal standard. In re Marriage of Horner, 151 Wn.2d 884, 894, 93 P.3d 124 (2004).

The parties agree that Victoria has standing to petition the superior court for the relief sought. The question before us is whether the superior court, having identified the applicable legal standard, abused its discretion by concluding that removing Del Sesto and Northern as acting co-trustees, and replacing them with Whittier, was not proved to be in James's best interest.

A guardian is charged with the duty to, among other obligations, "assert the incapacitated person's rights and best interests." RCW 11.92.043(4). When exercising this duty, a "guardian[ ] must work for the individualized best interests of each ward." In re Guardianship of Lamb, 173 Wn.2d 173, 191, 265 P.3d 876 (2011). This means that "a guardian must make decisions 'on a case-by-case basis with *particularized consideration of the best interests and rights of the specific individual.'*" Lamb, 173 Wn.2d at 191 (quoting In re Guardianship of Hamlin, 102 Wn.2d 810, 815, 689 P.2d 1372 (1984)).

Courts ensure that the best interest of the ward is upheld by requiring that a court-appointed guardian "shall at all times be under the general direction and control of the court making the appointment." RCW 11.92.010. In fact,

> [t]he guardian's opinion as to the ward's best interest is not dispositive—where there is a conflict . . . the superior court must resolve the conflict. Hamlin, 102 Wn.2d at 820-21; see also In re Guardianship of Ingram, 102 Wn.2d 827, 842, 689 P.2d 1363 (1984) ("[T]he court need not place on any party any particular burden of proof or persuasion, nor give any presumption of validity to the petition of the guardian or guardian ad litem."). Thus, while the guardian has the authority to "assert the incapacitated person's rights and best interests," RCW 11.92.043(4), it remains at all times the responsibility of the court to make the decision as to the ward's best interest. Ingram, 102 Wn.2d at 842. The goal of a guardianship is to do what the ward would do, if the ward were competent to make the decision in question. Id. at 838.

Lamb, 173 Wn.2d at 191 n.13. In this regard, "'[t]he court having jurisdiction of a guardianship matter is said to be the superior guardian of the ward, while the person appointed guardian is deemed to be an officer of the court.'" Lamb, 173 Wn.2d at 190 (quoting Seattle-First Nat'l Bank v. Brommers, 89 Wn.2d 190, 200, 570 P.2d 1035 (1977)); see also In re Guardianship of Hallauer, 44 Wn. App. 795, 797, 723 P.2d 1161 (1986) ("Although governed by statute, guardianships are equitable creations of the courts and it is the court that retains ultimate responsibility for protecting the ward's person and estate."); In re Guardianship of Gaddis, 12 Wn.2d 114, 123, 120 P.2d 849 (1942) ("The guardian, in so far as matters pertaining to his trust are concerned, is directly responsible only to the court of his appointment. The guardian is in effect an agent of the court, and through him the court seeks to protect the ward's interest." (citation omitted)).

Here, the superior court considered the range of evidence that was

presented regarding whether a change of trustee was proved to be in James's best interest. It made a choice, among the alternatives, that was within that range of evidence. This choice was supported by substantial evidence. Thus, the superior court did not abuse its discretion by concluding that removing Del Sesto and Northern as acting co-trustees, and replacing them with Whittier, was not proved to be in James's best interest.[11]

### III

Victoria next contends that the superior court erred by denying her motion for reconsideration. This is so, she asserts, both because she maintains that removing Del Sesto and Northern as acting co-trustees, and replacing them with Whittier, was proved to be in James's best interest, and because James, in 2008, lacked the mental capacity to choose Del Sesto and Northern as co-trustees. Both of these assertions are unavailing.

First, Victoria's argument on reconsideration regarding James's best interest was the same argument that she asserted in her initial petition. It fails for the reasons previously set forth.

Second, Victoria's argument regarding James's alleged mental incapacity was a new theory that she was not permitted to raise on reconsideration. See Wilcox v. Lexington Eye Inst., 130 Wn. App. 234, 241, 122 P.3d 729 (2005) ("CR

---

[11] Victoria also contends that the superior court erred both by "preventing [Victoria] from fulfilling her duty to protect the ward's estate from diminishing unnecessarily as the result of excessive trustee fees," and by "substituting its judgment" for her judgment as James's guardian. Opening Br. of Appellant at 2.

Victoria's contention is inconsistent with the superior court's role as "'the superior guardian of the ward.'" Lamb, 173 Wn.2d at 190 (quoting Brommers, 89 Wn.2d at 200). Victoria's grandiose self-appraisal of her role is unsupported in the law.

59 does not permit a plaintiff to propose new theories of the case that could have been raised before entry of an adverse decision.").

In addition to the fact that Victoria improperly raised this new theory on reconsideration, the medical report to which she cited does not support her assertion that James, in 2008, lacked the mental capacity to choose Del Sesto and Northern as successor co-trustees.[12] The 2014 medical report sets forth James's medical condition *in 2014*. The doctor who authored this report diagnosed James, *in 2014*, with "severe frontal lobe dementia." At that time, the doctor opined that James's diagnosed condition had been "present since at least 2008," but that it was characterized by a "slowly progressive inexorable decline." The report nowhere states that James's condition in 2014 was the same as it was in 2008. Indeed, it supports the contrary conclusion. Thus, the medical report does not support the assertion that James lacked the capacity, in 2008, to choose Del Sesto and Northern as successor co-trustees. The superior court was not obligated to rule in reliance on this evidence and did not err by declining to do so.

Affirmed.

We concur:

_____

_____    _____

_____

[12] In her briefing in support of her motion for reconsideration, Victoria asserted that the dementia diagnosis was made in 2005 but cites to the 2014 medical report as support for this contention. The 2014 report does not support this assertion.