# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| In the Matter of the Detention of: | No.  56491-2-II |
| | Consol. w/ |
| A.N. | No.  56629-0-II |
| Petitioner. | UNPUBLISHED OPINION |

LEE, J. — A.N. appeals orders committing him to a 180-day civil commitment and authorizing involuntary treatment with antipsychotic medications.  A.N. argues that there is insufficient evidence to support the jury's finding that A.N. is gravely disabled.  A.N. also argues that the superior court commissioner failed to make a substantive finding regarding medical appropriateness and made an inadequate substituted judgment in its order authorizing involuntary treatment with antipsychotic medications.

We hold that substantial evidence supports the jury's finding that A.N. is gravely disabled, and the superior court commissioner did not err in ordering involuntary treatment with antipsychotic medications.  Therefore, we affirm both orders.

### FACTS

A.    BACKGROUND

In December 2019, A.N. was arrested and charged with felony stalking for allegedly stalking a victim for over two years despite there being an active no-contact order in place.  A.N. told authorities that the victim was his girlfriend.

In June 2020, the superior court ordered A.N. be admitted to Western State Hospital (WSH) for competency restoration.  A.N.'s June 2020 admission was his third admission to WSH since

2013. A.N.'s prior admissions were also the result of competency restoration orders following arrests for stalking, violation of an anti-harassment order, and criminal trespass. A.N. has never been convicted of any crime; rather, he has a "history of being charged with, and then found incompetent on," various criminal charges. Clerk's Papers (CP) at 6.

At the time of his June 2020 admission to WSH, A.N. had exhibited "paranoid thoughts regarding the legal system and delusional beliefs that painted himself as being the victim." CP at 65. A.N. "claimed that his girlfriend had called the police in an effort to help him expose judges who act as though they were above the law and that being in jail would help him with the task of exposing their options(sic) to the world." CP at 65. Additionally, A.N. wanted his case to "go to the Supreme Court" and to sue the Supreme Court. CP at 65. WSH diagnosed A.N. with "Delusional Disorder—Grandiose, Persecutory, and Erotomanic Type." CP at 9.

In July 2020, the superior court ordered a second period of competency restoration and for an evaluation to determine if A.N. was competent to stand trial for the felony stalking charge. WSH determined A.N. to be incompetent to stand trial, and the court dismissed the felony stalking charge.

In November 2020, A.N.'s treating psychiatrist and psychologist jointly filed a petition for a 180-day involuntary treatment pursuant to chapter 71.05 RCW. The petition stated that A.N. was both gravely disabled and presented "a substantial likelihood of repeating similar acts" to that of his criminal charge. CP at 2. However, A.N. agreed to stipulate to a 90-day civil commitment if WSH proceeded with its petition on the basis of grave disability only. WSH accepted A.N.'s stipulation.

2

In April 2021, A.N.'s treating psychiatrist and psychologist jointly filed a 180-day involuntary treatment petition. The petition alleged that A.N. was gravely disabled and that he required continued treatment at WSH. A.N. requested a jury trial, which the court set for September.

Prior to trial, A.N.'s new psychiatrist, Dr. Mary Zesiewicz, and psychologist, Dr. Elwyn Hulse, filed an amended 180-day involuntary treatment petition and joint declaration. According to the joint declaration, A.N. did not have anywhere to go if released, did not "'agree to be released if [he didn't] have a place to go,'" would not take medication, and did not believe he was mentally ill. CP at 66. A.N. compared himself to George Floyd and stated it was unfair that George Floyd's family had been compensated when A.N. had not been compensated for his suffering. A.N. insisted that he continued to be in a relationship with his stalking victim and would attempt to see her upon his release. Additionally, A.N. asserted that he wanted to "'fight corrupt judges,'" he stays at WSH to "'get justice,'" his stalking victim "'put [him] in prison'" when she called the police, and the judge "put [him] in jail illegally." CP at 69, 71, 73.

B.     JURY TRIAL

In September 2021, the superior court held a three-day jury trial on the amended involuntary commitment petition. Dr. Zesiewicz, Dr. Hulse, and A.N. testified.

1.     Dr. Zesiewicz's Testimony

Dr. Zesiewicz, a clinical psychiatrist at WSH, testified regarding her interactions with A.N. Dr. Zesiewicz began treating A.N. in June 2020, and had extensive sessions with him each time they met. In preparation for trial, she reviewed A.N.'s records and collaborated with other members of his treatment team.

Dr. Zesiewicz testified that while A.N. presented well and was intelligent, "there are several areas of his life that he has honed in on to the exclusion of everything else . . . what [she] would consider to be an excessive preoccupation." Verbatim Rep. of Proc. (VRP) (Sept. 15, 2021) at 125. Specifically, A.N. believed the purpose of his jury trial was to "expose the truth" of the world's injustice and corruption and he would "exclusively focus[] on two women." VRP (Sept. 15, 2021) at 126-27. Dr. Zesiewicz also testified:

> So, [A.N.] has told me numerous times that if he's released from the hospital . . . ["]I will commit a crime because the police will pick me up, they'll take me to jail, and then I will come back to [WSH."] And then another time he told me; ["]I will send this woman flowers and she will call the police, and I will get picked up and I will be brought right back to jail.["] And so he has said it in different ways but the theme is the same.

VRP (Sept. 15, 2021) at 129. According to Dr. Zesiewicz, A.N. adamantly denies having any behavioral health disorder. This denial, she stated, "limits his ability to look at issues related to what's in his best interest." 2 VRP (Sept. 16, 2021) at 15. Dr. Zesiewicz further testified that A.N. responds to internal stimuli, "meaning [A.N.'s] own reality. There's a lot going on within him, and he is talking in response to what's going on in his own mind." 2 VRP (Sept. 16, 2021) at 33.

At WSH, A.N. is in the highest level of psychiatric care with "extensive staff support." 2 VRP (Sept. 16, 2021) at 44. Dr. Zesiewicz stated, "[A.N.] is very dependent on the [WSH] structure of the day to have [his] basic needs met." 2 VRP (Sept. 16, 2021) at 44. Dr. Zesiewicz further stated she did not believe a less restrictive placement was appropriate for A.N. because of "his almost exclusive intent on escaping and doing something—in his word, like he says, 'To go to jail,' that . . . is putting—it puts him at risk; it puts the community at risk." 2 VRP (Sept. 16, 2021) at 48.

4

2.      Dr. Hulse's Testimony

Dr. Hulse is a psychologist at WSH. As a staff psychologist, Dr. Hulse monitors the behavior of patients on his ward, which includes A.N. Dr. Hulse sees A.N. every day and speaks with A.N. more thoroughly approximately once a month where Dr. Hulse would assess A.N.'s behavioral health condition.

Dr. Hulse testified that A.N. has "delusional disorder multiple types," specifically erotomania, grandiose, and persecutory. 2 VRP (Sept. 16, 2021) at 86. Dr. Hulse stated:

> The erotomania is the delusion that someone above you in status is in love with you and you have a relationship with them even though they may not even know that you're alive.
>
> . . . .
>
> . . . [W]ith regard to the grandiose delusions he has told me that he wants to be a Nelson Mandela or George Floyd type person in history, and that he is . . . following in their footsteps.
>       With regard to persecution . . . he consistently tells me about corrupt police officers . . . good judges and bad judges . . . . [W]e have an enclosed patio . . . where we have a camera so we can, kind of, see what goes on out there. . . . [A.N.] was staring up at the camera, gesturing and talking to the camera. So I followed up with him and I asked him . . . who were you talking to? What were you saying? And he said he was talking to the police because this was a direct line to the police, that camera.

2 VRP (Sept. 16, 2021) at 87-88. Dr. Hulse also shared other examples of A.N.'s delusional symptoms, including that A.N. believes "women are in love with him. They are part of his anti-conspiracy program because they are helping him stay in jail." 2 VRP (Sept. 16, 2021) at 88. Dr. Hulse further testified that A.N.'s delusions impact his perception of reality, along with his ability to reason and think clearly. Additionally, A.N.'s delusions affect his ability to abstain from certain actions, such as contacting the woman he stalked.

Dr. Hulse also testified that A.N. does not have insight into his behavioral health disorder and "continues to act on his distortion of reality." 3 VRP (Sept. 20, 2021) at 119. Dr. Hulse stated that A.N. would likely be able to obtain food if on his own; however, Dr. Hulse expressed concern that, if released from WSH, A.N. would not be able to meet other basic health and safety needs. Specifically, A.N. has "very limited cognitive control" and A.N.'s "laser focus[] on psychotic thoughts and action" evidences a loss of volitional control. 3 VRP (Sept. 20, 2021) at 129-30. Furthermore, Dr. Hulse testified, "[T]he biggest need is safety. It's community safety." 3 VRP (Sept. 20, 2021) at 130.

3.      A.N.'s Testimony

A.N. testified he does not believe he has a behavioral health disorder. He further testified that he would have the ability to feed himself, but whether he could or would seek shelter was "[his] business." 3 VRP (Sept. 20, 2021) at 156. A.N. also stated:

> The corrupt justices are covering up their bad behavior, their bad actions. And they're the—they said that I'm mentally ill so that they could throw me in here and close my case. If you're mentally ill you have to take medicine for your whole life but I haven't taken any medicine. It's very easy. I am asking the Court to release my records for the entire country to be able to see them. That's what I'm asking the jury to do.

3 VRP (Sept. 20, 2021) at 157.

A.N. shared that he believed himself to be a victim of "the bar association," "corrupt judges," "several of the doctors [at WSH]," and "US bank," among other groups and individuals. 3 VRP (Sept. 20, 2021) at 158. He testified:

> I'm here in order to raise my voice against all 50 governors of the United States and all 100 senators, all 435 US representatives and all of the presidents, including all of the past presidents of this country. All of them are domestic criminals, and I would like to declare that I am not mentally ill.

6

. . . .

> I have the cognitive ability in order to stand up and resist the corrupt justices. The corrupt judges are trying to hide their evil crimes and so that's why they said that I am mentally ill.

3 VRP (Sept. 20, 2021) at 159-61. A.N. further testified that upon release, he would immediately "go look for [his] girlfriend in order for the police to arrest [him] so [he] can be put in jail and continue to bring charges or to resist the corrupt judges." 3 VRP (Sept. 20, 2021) at 161.

    4.    Jury Instructions

During trial, the trial court requested that both parties submit proposed jury instructions. The State submitted proposed jury instructions, and the trial court asked the parties if there were any exceptions or objections to the State's proposed jury instructions. A.N. stated that he had no objection to the State's proposed jury instructions nor did he wish to propose any additional jury instructions. The superior court adopted the State's proposed jury instructions.

Jury instruction no. 6 instructed jurors on the definition of "gravely disabled." The instruction stated:

> Gravely disabled means a condition in which a person, as a result of a behavioral health disorder:
> (1) is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety, or
> (2) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving or would not receive, if released, such care as is essential for his or her health or safety.

CP at 113. Additionally, jury instruction no. 8 stated, in pertinent part:

> In order to answer any question on the verdict form, ten jurors must agree upon the answer. It is not necessary that the jurors who agree on the answer be the

7

same jurors who agreed on the answer to any other question, so long as ten jurors agree to each answer.

CP at 116.

5.      Jury Verdict

The jury found that A.N. had a behavioral health disorder, that he was gravely disabled as a result of his behavioral health disorder, and that he should be committed for involuntary treatment at WSH for 180 days. The trial court polled the jury, and each juror confirmed that the verdict was his or her verdict. The trial court entered an order for A.N. to be committed for 180 days at WSH.

C.      ANTIPSYCHOTIC MEDICATION PETITION AND HEARING

On October 29, 2021, Dr. Michele Hines, a psychiatrist at WSH, filed a petition to involuntarily treat A.N. with antipsychotic medication. In the petition, Dr. Hines stated that A.N. had been advised of his need for antipsychotic medication, but that A.N. refused, citing concerns about the medications' side effects in addition to a desire to stay at WSH "'to overturn the current U.S. Constitution.'" CP at 122. A.N. expressed concerns that the medication would cause him to develop heart problems. But Dr. Hines stated that A.N. "already has atrial fibrillation, is on medication for it, and has been deemed to be stable by his medical doctor and his cardiologist. Antipsychotic medication is unlikely to worsen this problem and may actually improve it." CP at 126.

Dr. Hines also stated that A.N. would likely be able to return to the community if on medication and that he had not been adequately treated due to his refusal to take medication. Without medication, A.N.'s stay at WSH would likely be prolonged.

On November 23, 2021, the superior court commissioner held a hearing on the medication petition. Dr. Hines and A.N. testified.

1.    Dr. Hines' Testimony

Dr. Hines, a licensed psychiatrist at WSH, assumed care of A.N. in December 2020. She diagnosed A.N. with "[p]sychosis not otherwise specified" and stated that A.N.'s primary symptom was a set of fixed delusions. VRP (Nov. 23, 2021) at 7. She testified:

> [A.N.] believes that he is the victim of the judicial system in the United States and that he has been put in the hospital for the purpose of revealing some sort of global injustice wherein his presence in the hospital is going to lead to millions of victimizations being revealed and ultimately overthrow [sic] of the United States government.

VRP (Nov. 23, 2021) at 7. She further testified that she believed treatment with antipsychotic medication would be effective for A.N. because "most people who have psychosis and take anti-psychotic medication respond to it." VRP (Nov. 23, 2021) at 8. Dr. Hines provided verbal and written information to A.N. about adverse side effects of the medication. As to A.N.'s concerns regarding cardiac problems, Dr. Hines testified:

> [A.N.] has a cardiac history. He developed, first of all, atrial fibrillation, an arrhythmia of the heart, for which he now takes medication and which he has been stabilized. And he also had an episode of heart failure several years ago, 2016. But he has had several evaluations since then and all of that has improved. Nevertheless, he has regular followup [sic] ongoing and will have that as long as he is here.

VRP (Nov. 23, 2021) at 9-10.

A.N.'s prior heart failure was secondary to a gastrointestinal bleed, and Dr. Hines testified that once A.N.'s bleed was treated, "[h]e recovered so that he no longer has heart failure." VRP (Nov. 23, 2021) at 16. Dr. Hines stated that should A.N. take antipsychotic medication, WSH

9

would monitor him closely through "bio sign monitoring," frequent check-ins, and reviews with medical doctors and a cardiologist. VRP (Nov. 23, 2021) at 10. Dr. Hines also testified that A.N. recently saw a cardiologist, who recommended an echocardiogram "as a followup [sic] even though [A.N.'s] current cardiac condition is stable." VRP (Nov. 23, 2021) at 10-11. WSH would arrange for A.N. to get the echocardiogram. However, Dr. Hines was unaware if A.N. directly discussed side effects of antipsychotic medication with the cardiologist as the cardiologist's notes did not indicate one way or the other.

Dr. Hines stated she would not recommend A.N. for discharge as long as he continued having delusions, and that without medication, his delusions were unlikely to go away on their own. Dr. Hines also noted that A.N. "has had years of less restrictive alternatives and they have not had any impact." VRP (Nov. 23, 2021) at 14.

2.    A.N.'s Testimony

A.N. testified at the medication hearing. A.N. stated that he did not believe he had any behavioral health problems and that he was at WSH because of "the corrupt judge and corrupt officials." VRP (Nov. 23, 2021) at 19. When asked if he had any concerns about the medication side effects, A.N. stated: "Of course . . . I don't have any mental problems. I should not be taking [medication]. But also, it is affecting my heart—bleeding to death even, yeah. It is clearly shown in my records." VRP (Nov. 23, 2021) at 20-21.

3. Commissioner Ruling and Order

The superior court commissioner found by clear, cogent, and convincing evidence that the State had a compelling interest in involuntarily administering antipsychotic medication to A.N. and that the proposed treatment was necessary. In its oral ruling, the commissioner referred to Dr. Hines' testimony, citing A.N.'s refusal to consent to medication and the fact that other, less restrictive treatments had been unsuccessful. The commissioner also addressed A.N.'s concerns regarding the medication side effects in light of his current health condition:

> Now, [A.N.] has a heart condition that arose, I believe, in 2016, with a heart failure. He has an arrhythmia. The doctor has discussed with him the potential side effects of taking this medication both verbally and in written information form in his native language . . . and that was given to him in writing. He recently had a consultation with his cardiologist. The records don't reflect whether or not the doctor spoke with him about the side effects but, certainly, [A.N.] had the opportunity to discuss the side effects of the medication with his cardiologist. . . .
>
> It is [Dr. Hines'] understanding from consulting with the records that [A.N.'s] arrhythmia resulted from some gastrointestinal disorder which was previously addressed and that there may have been some arrhythmia since that time but it was ultimately addressed at that time. The doctor has stated that without the prescription or the prescribing of the anti-psychotic medication that [A.N.'s] stay at [WSH] will be prolonged. [Dr. Hines] could not identify how long it would be extended. However, [A.N.] has had this fixed delusion since 2013 and no other treatment has been effective in addressing it.

VRP (Nov. 23, 2021) at 25-26.

The superior court commissioner entered an order that incorporated the oral findings and ruling, authorizing the involuntary treatment of A.N. with antipsychotic medications for 180 days. The commissioner also noted that A.N. did not object to medication for any religious or moral reasons, and that A.N.'s family did not object to use of antipsychotic medication.

A.N. appeals.

11

ANALYSIS

A.N. argues on appeal that there is insufficient evidence to support the jury's finding that he is gravely disabled and the superior court commissioner erred in ordering involuntary treatment with antipsychotic medications. We disagree.

A.      GRAVELY DISABLED[1]

A.N. argues that the State did not sufficiently prove that he was gravely disabled under either prong of RCW 71.05.020(24).[2] The State argues that sufficient evidence supports the jury's verdict finding A.N. was gravely disabled and that either prong under RCW 71.05.020(24) provides a basis for the jury's verdict. We agree with the State.

1.      Legal Principles

Appellate courts review challenges to the sufficiency of the evidence in a light most favorable to the State. *In re Det. of B.M.*, 7 Wn. App. 2d 70, 85, 432 P.3d 459, *review denied*, 193 Wn.2d 1017 (2019). In 180-day commitment proceedings, the State bears the burden of presenting clear, cogent, and convincing evidence. RCW 71.05.310; *In re LaBelle*, 107 Wn.2d 196, 209, 728 P.2d 138 (1986).

---

[1] The order at issue in this case has expired. However, because involuntary commitment orders have collateral consequences for future commitment determinations, this appeal is not moot. *In re Det. of M.K.*, 168 Wn. App. 621, 622, 279 P.3d 897 (2012).

[2] RCW 71.05.020(24) has two alternative prongs under which a person can be found "gravely disabled." Under the first prong, "a person, as a result of a behavioral health disorder . . . [i]s in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety." RCW 71.05.020(24)(a). Under the second prong, a person, as a result of a behavioral health disorder "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety." RCW 71.05.020(24)(b).

An individual may be involuntarily committed for behavioral health treatment if, as a result of a behavioral health disorder, that person is "gravely disabled." *LaBelle*, 107 Wn.2d at 201-02. Thus, the State must prove grave disability by clear, cogent, and convincing evidence. RCW 71.05.310; *Morris v. Blaker*, 118 Wn.2d 133, 137, 821 P.2d 482 (1992).

When the standard is clear, cogent, and convincing evidence, "the ultimate fact in issue must be shown by evidence to be 'highly probable.'" *LaBelle*, 107 Wn.2d at 209 (quoting *Pawling v. Goodwin*, 101 Wn.2d 392, 399, 679 P.2d 916 (1984)). "[A]ppellate review is limited to determining whether substantial evidence supports the findings and, if so, whether the findings in turn support the trial court's conclusions of law and judgment." *Id.* If substantial evidence supports the trial court's findings, then appellate courts will not disturb those findings. *Id.*

There are two ways the State may prove that a person is "gravely disabled." *Id.* at 202. Under RCW 71.05.020(24), a gravely disabled person is one who

> as a result of a behavioral health disorder: (a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety;

Courts "must consider the symptoms and behavior of the respondent in light of all available evidence concerning the respondent's historical behavior." RCW 71.05.245(1). Additionally, certain symptoms or behaviors may support a finding of grave disability if they "are closely associated with symptoms or behavior which preceded and led to a past incident of involuntary hospitalization, severe deterioration, or one or more violent acts," "these symptoms or behavior represent a marked and concerning change in the baseline behavior of the respondent," and

"without treatment, the continued deterioration of the respondent is probable." RCW 71.05.245(2).

a.      RCW 71.05.020(24)(a): Danger of serious physical harm from failure to provide for essential health and safety needs

Under RCW 71.05.020(24)(a), the State must show that an individual "is in danger of serious physical harm as a result of his or her failure to provide for essential health and safety needs." *LaBelle*, 107 Wn.2d at 203. This requires a showing of a substantial risk of serious physical harm, evidenced by

> failure or inability to provide for such essential human needs as food, clothing, shelter, and medical treatment which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded. Furthermore, the failure or inability to provide for these essential needs must be shown to arise as a result of mental disorder and not because of other factors.

*Id.* at 204-05.

The State need not show that an individual would fail to provide for all essential human needs; rather, the State need only present evidence that an individual's failure to provide for at least one essential human need would result in a high probability of serious physical harm unless adequate treatment is afforded. *See In re Det. of A.F.*, 20 Wn. App. 2d 115, 126-27, 498 P.3d 1006 (2021), *review denied*, 199 Wn.2d 1009 (2022) (holding that an individual's mental illness that prevented him from seeking out and obtaining appropriate medical care supported a finding of grave disability).

b.      RCW 71.05.020(24)(b): Severe deterioration in routine functioning

Under RCW 71.05.020(24)(b), the State must show that (1) an individual manifests severe behavioral health deterioration in routine functioning and (2) the individual would not receive, if

released, essential care for his or her health and safety. RCW 71.05.020(24)(b); *LaBelle*, 107 Wn.2d at 205. Evidence must provide a factual basis for concluding that an individual suffers from severe deterioration. *Labelle*, 107 Wn.2d at 208.

> Such evidence must include recent proof of significant loss of cognitive or volitional control. In addition, the evidence must reveal a factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential for his or her health or safety. It is not enough to show that care and treatment of an individual's mental illness would be preferred or beneficial or even in his best interests. To justify commitment, such care must be shown to be *essential* to an individual's health or safety and the evidence should indicate the harmful consequences likely to follow if involuntary treatment is not ordered.

*Id.* (emphasis in original). Furthermore, the individual must be unable to make rational decisions regarding his or her treatment. *Id.*

2. Jury Verdict and 180-Day Commitment Order

a. RCW 71.05.020(24)(a)

A.N. argues that the State did not prove that he would be unable to provide for his essential needs as required under RCW 71.05.020(24)(a). Specifically, A.N. asserts that the State did not present evidence that he could not feed himself, clothe himself, or find shelter. Additionally, A.N. points to instances in the past when he has taken medication for health issues other than behavioral health as evidence he would be able to obtain medical treatment.

During the trial, while Dr. Hulse testified that A.N. would likely be able to procure food for himself, Dr. Hulse expressed concerns that A.N. would not access behavioral health care. Dr. Hulse stated that because of A.N.'s delusional disorder, he did not think A.N. would voluntarily participate in behavioral health treatment, and A.N.'s failure to seek treatment would place A.N. at risk of serious physical harm. Specifically, Dr. Hulse testified that A.N.'s expressed desire to

be arrested by the police and placed in jail would be detrimental to his treatment. Dr. Hulse also testified that A.N.'s delusional disorder impacts A.N.'s ability to interact with others and A.N. does not understand how his condition affects his behavior.

Dr. Zesiewicz also testified that A.N.'s desire to go to jail was "the last thing he needs" because jail is "not a safe place for . . . [A.N.] at his age and with his complex medical conditions," specifically his "cardiac problem and lung problem." 2 VRP (Sept. 16, 2021) at 49.

A.N. testified that he does not believe he has a behavioral health disorder and that upon discharge, he would "go look for [his] girlfriend in order for the police to arrest [him] so that [he] can be put in jail." 3 VRP (Sept. 20, 2021) at 161.

Here, Dr. Hulse's testimony, Dr. Zesiewicz's testimony, and A.N.'s testimony are evidence that A.N. would not seek behavioral health care, an "essential human need" under RCW 71.05.020(24)(a). *See LaBelle*, 107 Wn.2d at 204-05. Thus, the evidence in the record shows that it is highly probable that A.N.'s inability or failure to seek behavioral health care would result in his arrest and placement in jail—indeed, A.N. stated his desire for such an outcome—which poses a risk of serious physical harm to A.N. in light of his medical conditions.

Furthermore, A.N.'s inability or failure to seek care is a direct result of his behavioral health disorder. A.N. asserts that because he took medication for past medical conditions, he "has demonstrated his ability to manage his health conditions by voluntarily taking medications and working with his doctor." Br. of Appellant at 26-27. However, A.N. stated, "I am not mentally ill. . . . If you're mentally ill you have to take medicine for your whole life but I haven't taken any medicine. It's very easy." 3 VRP (Sept. 20, 2021) at 157. Dr. Zesiewicz testified that A.N. "has

been very clear that he will not accept any psychotropic medication." 2 VRP (Sept. 16, 2021) at 42.

The State need only show that an individual would fail to meet at least one essential need which would risk substantial physical harm. *See A.F.*, 20 Wn. App. 2d at 127. Here, the record shows the State had met its burden. Therefore, we hold there is substantial evidence upon which a jury could have reasonably relied on to find by clear, cogent, and convincing evidence that A.N. is gravely disabled under prong (a).

        b.      RCW 71.05.020(24)(b)

A.N. argues that there is insufficient evidence to prove that he is gravely disabled under "prong (b)." Br. of Appellant at 30. Specifically, A.N. argues that the State did not sufficiently prove that A.N.'s release would result in serious physical harm to him and that treatment at WSH was essential to prevent the serious physical harm. Conversely, the State argues that the record supports "civil commitment under prong (b) because A.N. has a history of repeated and escalating loss of cognitive control." Br. of Resp't at 22. We agree with the State.

Dr. Hulse testified that A.N., without care and supervision at WSH, would begin to decompensate. A.N. has grandiose delusions and "continues to act on his distortion of reality." 3 VRP (Sept. 20, 2021) at 119. A.N. is unable to move beyond his fixed delusions despite attempts to reason with him. Dr. Hulse also testified that A.N. has "very limited cognitive control" and a "laser focus[] on psychotic thoughts and actions." 3 VRP (Sept. 20, 2021) at 129, 130. For example, A.N. was talking to a camera at WSH, believing that he was talking to the police because the camera "was a direct line to the police." 2 VRP (Sept. 16, 2021) at 88. A.N. does "not receiv[e] feedback from the environment, and [he does] not back[] off of what he's doing." 3 VRP (Sept.

20, 2021) at 130. Also, Dr. Hulse does not believe there is a less restrictive setting that could meet A.N.'s needs.

Dr. Zesiewicz's testimony corroborated Dr. Hulse's testimony. Dr. Zesiewicz testified that A.N. is "very preoccupied with [his girlfriend]. [A.N.] talks a lot about her." 2 VRP (Sept. 16, 2021) at 57. A.N. has often stated that his plan and intent when he is discharged is to send his girlfriend flowers or call her, "'and she will call the police and I will immediately go to jail.'" 2 VRP (Sept. 16, 2021) at 57. Also, A.N. has an "almost exclusive intent on escaping and doing something" to go to jail, putting him at risk. 2 VRP (Sept. 16, 2021) at 48. And A.N. responds to internal stimuli, talking in response to what is going on in his own mind. Dr. Zesiewicz believes that A.N. "is very dependent on the structure of the day [at WSH] to have [his] basic needs met." 2 VRP (Sept. 16, 2021) at 44. At WSH, A.N. "is in a locked unit where there is monitoring 24/7." 2 VRP (Sept. 16, 2021) at 44.

Furthermore, when A.N. testified, he continually denied having a behavioral health disorder. He stated, "I am not mentally ill. . . . The corrupt justices are covering up their bad behavior, their bad actions. . . . [T]hey said that I'm mentally ill so that they could throw me in here and close my case. If you're mentally ill you have to take medicine for your whole life but I haven't taken any medicine." 3 VRP (Sept. 20, 2021) at 157.

Here, A.N.'s inability to move past his fixed delusions and his laser focus on psychotic thoughts and actions is evidence of his significant loss of cognitive control. Substantial evidence in the record shows that A.N.'s loss of cognitive control is a direct result of his delusion disorder. A.N.'s continual denial of and lack of insight into his behavioral health disorder is evidence that he would not access or receive behavioral health care essential for his health and safety.

18

Furthermore, A.N.'s clear intention to do something to immediately get arrested is a harmful consequence in the event of his release.

A.N. currently resides in a locked ward where he has access to "extensive staff support." 2 VRP (Sept. 16, 2021) at 44. Dr. Hulse's and Dr. Zesiewicz's testimony suggest that A.N. would continue to decompensate without the support of WSH. Additionally, continued care at WSH would prevent harmful consequences of A.N. doing something to get arrested and put into jail. Thus, there is substantial evidence upon which a jury could have reasonably relied on to find by clear, cogent, and convincing evidence that A.N. is gravely disabled under prong (b).

B. JURY INSTRUCTIONS AND VERDICT

A.N. argues that because the trial court did not require the jury to agree on the basis for its finding of grave disability, the court violated A.N.'s procedural due process rights. We disagree.

1. Legal Principles

Generally, an appellate court will not consider issues raised for the first time on appeal unless there is a "manifest error affecting a constitutional right." RAP 2.5(a)(3); *B.M.*, 7 Wn. App. 2d at 88-89. "The appellant must demonstrate the error is manifest and 'truly of constitutional dimension,'" meaning "there must be a showing of actual prejudice." *B.M.*, 7 Wn. App. 2d at 89 (quoting *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009)). To demonstrate actual prejudice, a party must show that the asserted error had practical and identifiable consequences during the trial. *State v. Mosteller*, 162 Wn. App. 418, 426, 254 P.3d 201, *review denied*, 172 Wn.2d 1025 (2011). "In determining whether the error was identifiable, the trial record must be sufficient to determine the merits of the claim." *O'Hara*, 167 Wn.2d at 99.

2.      Jury Instructions and Verdict Form

A.N. argues that the trial court's failure to require at least 10 jurors "make the finding of grave disability under the same prong" in the jury instructions violated his procedural due process rights. Br. of Appellant at 35. A.N. asserts he may raise the issue for the first time on appeal because it is a "manifest constitutional error" under RAP 2.5(a). Br. of Appellant at 35. The State argues that A.N. failed to preserve the issue for review and that we should decline to review it. We exercise our discretion under RAP 2.5(a) to address the merits of A.N.'s argument.

"Procedural due process prohibits the State from depriving an individual of protected liberty interests without appropriate procedural safeguards." *State v. Lyons*, 199 Wn. App. 235, 240, 399 P.3d 557 (2017). Due process guaranties in commitment proceedings are satisfied when 10 out of 12 jurors agree upon a verdict. RCW 4.44.380; *Dunner v. McLaughlin*, 100 Wn.2d 832, 845, 676 P.2d 444 (1984). Here, all 12 jurors agreed that A.N. was "gravely disabled."

A.N.'s argument is rooted in the unanimity requirement from criminal cases. But courts in criminal cases distinguish between "multiple acts" cases and "alternative means" cases. A "multiple acts" case is when an individual commits several distinct criminal acts, but is charged with only one count. *In re Det. of Halgren*, 156 Wn.2d 795, 808, 132 P.3d 714 (2006). In such a circumstance, the State must elect the act upon which it relies for conviction. *Id.* Alternatively, "the jury must be unanimous as to which act or incident constitutes the crime." *State v. Kitchen*, 110 Wn.2d 403, 411, 756 P.2d 105 (1988). If the State fails to make an election or the trial court fails to instruct the jury regarding unanimity, there is constitutional error. *Id.* "The error stems from the possibility that some jurors may have relied on one act or incident and some another, resulting in a lack of unanimity on all of the elements necessary for a valid conviction." *Id.*

20

Conversely, in an "alternative means" case, "a single offense may be committed in more than one way," and "[u]nanimity is not required . . . as to the *means* by which the crime was committed so long as substantial evidence supports each alternative means." *Id.* at 410 (emphasis in original). *Halgren* and *Kitchen* involve criminal acts. However, even if the underlying principle of their holdings apply in an involuntary commitment case, A.N.'s unanimity argument fails.

A.N. did not commit several distinct acts with the State failing to elect a particular act to rely on for his commitment petition. Rather, A.N.'s case can be likened to an "alternative means" case. Under RCW 71.05.020(24), an individual may be found "gravely disabled" either under prong (a) *or* prong (b)—regardless of the means, the statute and outcome are the same. And, for the reasons discussed in section A above, substantial evidence supports the jury's finding that A.N. is "gravely disabled" under both prong (a) and prong (b). Therefore, A.N. cannot show prejudice. A.N.'s procedural due process argument fails.

C.     COURT'S SUBSTITUTED JUDGMENT FOR PROPOSED TREATMENT

A.N. argues that he has a due process right to a "'medical appropriateness'" finding, which the commissioner failed to do. Br. of Appellant at 44 (quoting *Riggins v. Nevada*, 504 U.S. 127, 135, 112 S. Ct. 1810, 118 L. Ed. 2d 479 (1992)). A.N. also argues that the commissioner failed to make an adequate substituted judgment when it ordered A.N. to be involuntarily medicated. We disagree.

1.     Legal Principles

Under the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution, an individual "possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs." *Washington v. Harper*, 494 U.S. 210, 221, 110 S. Ct. 1028, 108 L. Ed. 2d

178 (1990); *Lyons*, 199 Wn. App. at 240 ("The liberty interest in avoiding the unwanted administration of antipsychotic drugs gives rise to both substantive and procedural due process considerations."). An involuntarily committed individual has a right to refuse antipsychotic medication. *In re Det. of L.K.*, 14 Wn. App. 2d 542, 548, 471 P.3d 975 (2020). However, that right is not absolute; an involuntarily committed individual may not refuse medication if "it is determined that the failure to medicate may result in a likelihood of serious harm or substantial deterioration or substantially prolong the length of involuntary commitment and there is no less intrusive course of treatment than medication in the best interest of that person." RCW 71.05.215(1).

Because of the liberty interest at stake, the Washington Legislature has outlined procedural safeguards within RCW 71.05.215 and RCW 71.05.217. The petitioning party must prove by clear, cogent, and convincing evidence a compelling state interest that justifies overriding a patient's lack of consent. RCW 71.05.217(1)(j)(i). There must be an attempt to obtain informed consent prior to the administration of the medication and that attempt must be documented in the record. RCW 71.05.215(2)(a), (e). Additionally, a court must

> make specific findings of fact concerning: (A) The existence of one or more compelling state interests; (B) the necessity and effectiveness of the treatment; and (C) the person's desires regarding the proposed treatment. If the patient is unable to make a rational and informed decision about consenting to or refusing the proposed treatment, the court shall make a substituted judgment for the patient as if he or she were competent to make such a determination.

RCW 71.05.217(1)(j)(ii); *see B.M.*, 7 Wn. App. 2d at 79.

Compelling state interests include "'(1) the preservation of life; (2) the protection of interests of innocent third parties; (3) the prevention of suicide; and (4) maintenance of the ethical

integrity of the medical profession.'" *McCarthy v. Schuoler*, 106 Wn.2d 500, 508, 723 P.2d 1103 (1986) (quoting *In re Guardianship of Ingram*, 102 Wn.2d 827, 842, 689 P.2d 1363 (1984)). Additionally, when a court makes a substituted judgment for the individual, "the goal is not to do what most people would do, or what the court believes is the wise thing to do, but rather what this particular individual would do if [he] were competent and understood all the circumstances, including [his] present and future competency." *Ingram*, 102 Wn.2d at 839. Courts should consider the risk of adverse side effects, the ability of the individual to cooperate with post-treatment therapy, the wishes of family and friends, and the individual's religious or moral views, among other factors. *Id.* at 840. Neither RCW 71.05.215 nor RCW 71.05.217 allow medical professionals to substitute their judgment for procedures established by law. *L.K.*, 14 Wn. App. 2d at 552.

"When the standard is 'clear, cogent and convincing . . . the findings must be supported by substantial evidence in light of the highly probable test.'" *B.M.*, 7 Wn. App. 2d at 85 (alternation in original) (internal quotation marks omitted) (quoting *LaBelle*, 107 Wn.2d at 209).

2.     Medical Appropriateness

A.N. argues that the commissioner violated A.N.'s due process rights by not making a "medical appropriateness" finding, which is part of the "substantive" substituted judgment the court must make to order that A.N. be involuntarily medicated. Br. of Appellant at 52. A.N. cites to *Riggins* and *Sell v. United States*[3] to support his contention.

---

[3]  539 U.S. 166, 123 S. Ct. 2174, 156 L. Ed. 2d 197 (2003).

However, both *Riggins* and *Sell* involve the involuntary administration of medication for competency restoration purposes so defendants could stand trial. *See generally Riggins*, 504 U.S. at 129; *Sell*, 539 U.S. at 169. For instance, under *Sell*, the State may

> involuntarily . . . administer antipsychotic drugs to render a mentally ill defendant competent to stand trial on serious criminal charges if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the trial's fairness, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests.

539 U.S. at 167. "This standard will permit forced medication *solely for trial competence purposes* in certain instances." *Id.* (emphasis added); *accord Lyons*, 199 Wn. App. at 238 n.2 ("*Sell* establishes the requirements necessary for the State to obtain an order authorizing involuntary medication in order to restore competency to stand trial."). *Riggins* also addressed the involuntary administration of medication to a defendant in order to stand trial. 504 U.S. at 127.

*Sell* and *Riggins*, and the standards articulated therein, are inapplicable here. The issue of whether A.N. is competent to stand trial is not before this court.

2.     Substituted Judgment

A.N. argues that the commissioner did not make an adequate "substituted judgment" for A.N. to be involuntarily medicated. Br. of Appellant at 52. Specifically, A.N. asserts that the commissioner's substituted judgment "lacked a substantive discussion and consideration of A.N.'s rational concerns concerning his health conditions," and as a result, the medication order should be reversed. Br. of Appellant at 43. We disagree.[4]

---

[4] The involuntary medication order expired in May 2022. However, the issue is not moot "because like an involuntary commitment order, an order to involuntarily administer antipsychotic medication can have collateral consequences." *B.M.*, 7 Wn. App. 2d at 76.

During the medication hearing, Dr. Hines testified about A.N.'s delusions and the need for antipsychotic medication. Dr. Hines described that A.N. believes "that he has been put in the hospital for the purpose of revealing some sort of global injustice." VRP (Nov. 23, 2021) at 7. Additionally, A.N. told Dr. Hines that the woman who has a no-contact order against him is "keeping him in the hospital in order to overthrow corruption," and A.N. "plans to contact this woman" if discharged. VRP (Nov. 23, 2021) at 12-13.

Dr. Hines further testified that she had spoken with A.N. about the need for antipsychotic medication while also discussing potential adverse side effects with him. Dr. Hines provided both verbal and written information about the medication side effects to A.N., including written information in his native language. She described how WSH would closely monitor the effects of any medication on A.N. in light of his past cardiac issues and that A.N. had an opportunity to speak with a cardiologist. Dr. Hines stated that without medication, A.N.'s delusions would not go away on their own and that A.N. could remain at WSH indefinitely.

The superior court commissioner made an oral finding that the State had proved by clear, convincing, and cogent evidence A.N.'s need for antipsychotic medication. The commissioner cited to Dr. Hines' testimony and stated that "medications will assist [A.N.] in being more reality based. And it has been explained to him that [WSH] cannot assist him with discharge until he has addressed the delusions and to prevent the behaviors which led to hospitalization." VRP (Nov. 23, 2021) at 25. The commissioner also discussed A.N.'s concerns about medication side effects, noting that A.N. had the opportunity to speak with a cardiologist and that A.N. was no longer experiencing his prior cardiac issues.

In the written order, the superior court commissioner incorporated much of the same testimony cited in the oral ruling, and found that less intrusive treatments were ineffective and "[t]here is no other treatment available to address [A.N.'s] condition." CP at 132. In the written order, the commissioner also noted A.N.'s desires. The commissioner specifically noted that A.N. refused medications because he does not believe he has a behavioral health problem and that A.N. believed the medications "will [affect] his heart and will cause death." CP at 132.

Here, the superior court commissioner made specific findings concerning a compelling State interest, the necessity and effectiveness of treatment, and A.N.'s own desires regarding medication. And the commissioner noted A.N.'s delusion regarding "a woman he was previous[ly] involved with" and "that he would contact this woman upon discharge." CP at 131.

Also, the commissioner found that A.N. possessed the same delusion since 2013 and that prior treatments without medication were ineffective. The commissioner's order specifically found that there is no other treatment available to treat A.N.'s condition.

Finally, the record shows that the superior court commissioner considered the risk of adverse side effects, A.N.'s desires, and A.N.'s competency to make rational decisions. In its oral ruling, the commissioner stated that because of A.N.'s delusions, "he [was] not making rational decisions concerning his treatment and, therefore, the Court has the ability to substitute [its] judgment for [A.N.]." VRP (Nov. 23, 2021) at 26. The record also shows that the commissioner took Dr. Hines' testimony into consideration when the court made a substituted judgment. Thus, the record shows that the court made findings as dictated by RCW 71.05.215 and RCW 71.05.217. Because the commissioner followed the procedural safeguards of RCW 71.05.215 and RCW 71.05.217, the commissioner did not err in its substituted judgment.

CONCLUSION

Substantial evidence supports the jury's finding that A.N. is gravely disabled, and the commissioner did not err in ordering involuntary treatment with antipsychotic medications. Therefore, we affirm the orders committing A.N. to a 180-day civil commitment and authorizing involuntary treatment with antipsychotic medications.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Price, J.

We concur:

_____
Glasgow, CJ

_____
Cruser, J.